Darnell WATKINS, Appellant (Defendant Below),

v.

STATE of Indiana, Appellee (Plaintiff Below).

Kendall David WARNER, Appellant (Defendant Below),

v.

STATE of Indiana, Appellee (Plaintiff Below).

Ray SMITH, Appellant (Defendant Below),

v.

STATE of Indiana, Appellee (Plaintiff Below).

Nos. 978S198, 878S171 and 479S104.

Supreme Court of Indiana.

March 17, 1983.

950

Daniel L. Toomey, Toomey & Woloshansky, Merrillville, for appellant Darnell Watkins.

George Glendening, Hammond, for appellant Kendall David Warner.

Saul I. Ruman, Hammond, for appellant Ray Smith.

Theodore L. Sendak, Atty. Gen., Elmer Lloyd Whitmer, Deputy Atty. Gen., Indianapolis, for appellee.

PRENTICE, Justice.

Defendants (Appellants) were each convicted, after a joint trial by jury, of Murder, Ind.Code § 35–42–1–1 (Burns 1979) and sentenced to sixty (60) years imprisonment. An additional defendant, Levi Williams, was acquitted upon a motion for a directed verdict at the close of all the evidence. These three appeals were filed separately but have been consolidated for the convenience of the court. The issues assigned by each appellant, however, will be separately addressed.

## EVIDENCE

The evidence most favorable to the State was as hereinafter related.

Undisputed evidence discloses that at approximately 6:30 p.m. on October 8, 1977, three young men, Cornell Aaron, Ronnie Boone and Kenneth Hope were ambushed as they sat in a Chevrolet automobile parked at the curb alongside the Cunningham home which fronted on Columbia Avenue, in the City of Gary. Hope and Boone were in the front seat and Aaron was in the back seat. As many as three armed men, and possibly four, surrounded the vehicle and fired numerous shots into it. Aaron was killed, and Boone was seriously injured. Their companion, Fred Turner, was in the Cunningham residence visiting with his seventeen year old girlfriend, Debra Cunningham, who was also the mother of the three year old child of the defendant, Kendall Warner.

The police investigation produced no material evidence, except for statements of Boone, Hope, Turner and Debra. They sub-sequently gave depositions and ultimately testified at trial. Their testimony was partially consistent and partially inconsistent and contradictory, both with respect to each other's testimony and prior statements and with regard to their own prior statements and depositional testimony. Hope and Debra were impeached at trial and Turner was severely discredited, although not technically impeached.

Boone, who was the driver of the ambushed vehicle, testified that he and his companions drove to the Cunningham home and when they arrived, Turner went inside, and he and the other two were waiting in the car. While they were waiting, he heard someone yell from the rear of the car, "Hey, get out!" He looked back and saw someone whom he could not identify aiming a small pistol. Immediately after hearing the order, shots were fired, but he did not remember how many. He saw Hope, who was seated beside him in the front passenger's seat, slump to the floor and heard Aaron, who was in the back seat, say, "I'm hit! I'm hit!" Boone, himself, was wounded in the knee and in the back.

Although Boone was driving the automobile, it was a rental car that had been leased to Turner. Boone and the others had accompanied Turner to the Cunningham home on prior occasions, and although they had not gone previously in this vehicle, Boone had always been the driver.

Hope testified in substantial accordance with Boone's testimony. He, Boone and Aaron had been waiting in the automobile, drinking juice and listening to the radio while Turner was inside with Debra. He heard someone say "Here come some dudes with guns." and observed two men approach, the defendant Ray Smith and the defendant, Kendall Warner. He observed Warner, for from five to ten seconds and Smith for a longer period. Smith had a shotgun and aimed it at him point blank through the window but appeared to hesitate to fire it and then walked to the front of the vehicle. Shots came from behind, and Smith fired the shotgun through the

top of the windshield. Boone slid to the floor. Many shots were then fired over a span of ten to fifteen seconds. When he saw Warner, he saw no gun, but during the firing, he saw flashes come from Warner's position at the rear right side of the automobile.

Turner testified that at the time of the shooting, he was sitting in the Cunningham den, ten to twenty feet from where his companions waited in the automobile. He jumped up when he heard the shots and looked out the window. Debra was behind him and also looking out the window. She "yelled out, Darnell and Levi" (Watkins and Williams). Outside, he saw Warner at the right rear side of the car firing a pistol into it. He observed him for from four to five seconds. Another man was at the left rear of the car and a third was at its front. They had sawed off shotguns.

Aaron often wore Turner's clothes, and when he was shot, he was wearing Turner's blue jacket and blue hat.

On October 5, 1977, three days prior to the murder, he and Debra had been visiting in the den of the Cunningham home at about 11:30 p.m. Warner appeared outside and knocked on the window. He and Debra went outside and Turner asked him what he wanted. He replied that he was looking for Debra's sister, Danette. Turner called him a "punk" and told him not to come around anymore; whereupon Warner said "Punk, huh," and drew a pistol. He fired one shot in the air and ordered Turner up against a fence. Debra began hollering, and her parents came and yelled for him not to shoot. He fired two more shots and ran down the street.

Debra Cunningham, called as a witness for the State, testified that she "ducked" when she heard the gunfire and that her mind went blank. She acknowledged that she knew all of the defendants and that she had looked out the window, but she denied that she remembered seeing anybody. This testimony was contrary to statements that she had previously given to the police, and the State was then permitted to examine her as a hostile witness.

Debra acknowledged that Warner was the father of her child and that he had come to her home on the evening of October 5th, three days prior to the killing of Aaron, while Turner and she were visiting in the den, as related by Turner. Her version of the incident was substantially the same as Turner's except that she denied knowing who fired the shots. In this respect, she also acknowledged that in her statement to the police on October 8th she had said that Warner "pulled his pistol its a 38 with a long barrell, Kendall said to Fred Punk Uh Punk Uh, and fired one shot at Fred and Kendall ran off."

She had dated Turner for about two and one half years, and he called upon her almost daily. Occasionally he would come alone, but would not stay by himself. Usually his friends, Aaron, Boone and Hope would come with him and wait in the car. Sometimes they would wait for hours, "as long as he said." From time to time, she and Turner would go to a motel and have sexual relations. It was not uncommon for Aaron and Hope to drive them to the motel on these occasions and wait for them in the car.

*Debra Cunningham's Patterson Statements*

On October 8, 1977 Debra gave a signed statement to the police (State's Ex. 7) in which she said, inter alia, that when they heard a shot, she and Turner jumped up, looked out the window and saw Kendall Warner standing at the back of the car with a pistol in his hand. She saw flashes from the gun and heard Warner say "Let's get the hell out of here man!" Then he and another boy in blue jeans ran towards the alleyway.

On October 14, 1977, Debra gave a second signed statement to the police (State's Ex. 6). According to this statement, she had seen Warner, Watkins, Smith and Williams when she looked out the window. Warner was at the right rear of the car, Watkins at the left rear, Smith at the right front and Williams "in the street, by the front of the car." Warner was dancing up and down

and shooting a pistol. Smith was shooting a shotgun, and Watkins had a shotgun. She did not see a gun in Williams' hands. After the shooting, Smith and Williams ran across Columbia Avenue, and Warner and Watkins ran to the alley.

Her reason for then identifying the boys that she had not identified in her previous statement was that Turner had called her that morning and asked her to tell the police who the others were.

On January 12, 1978, Debra gave a deposition by which she again related the events of October 8th. Only a portion of the deposition came into evidence, but it was admitted without objection from Warner, Watkins or Smith. It disclosed that Debra had then testified that she saw three people on October 8th but could identify only two of them, Warner and Watkins, both of whom were firing weapons.

*Danette Cunningham testified* that she is Debra's sister and was present on October 5th when the shooting incident between Warner and Turner occurred. She heard Warner say "Punk". She could not identify the gun except to say that the barrel was "long, kind of long." Warner shot it two or three times. He telephoned later that night and apologized for the incident. Her boy friend was with her and hung up the phone at that point, so they did not finish talking.

After having had her memory refreshed by reference to a written statement that she had given to the police on October 8, 1977, Danette also testified that during that telephone conversation, Warner had also said that he was going to "get" Turner. She also testified that, in her opinion, Aaron and Turner looked alike.

### As to the Defendant Watkins

In their challenges to the sufficiency of the evidence, each defendant has placed great reliance upon the inconsistencies and contradictions between the testimony of Debra Cunningham and her out of court statements and further inconsistencies and contradictions in her three out of court statements. Watkins relies solely upon the argument that the evidence derived from her is not substantial evidence of probative value supporting the material fact of his presence at the scene. Obviously her in court testimony will not support a finding of such fact; and there was no other in court testimony or circumstantial evidence that placed him at the scene. Consequently, if the verdict is to stand, as to him, it must be upon the strength of hearsay statements attributed to her. Three such hearsay statements were admitted, two over objections and one without.

■ As previously related, Fred Turner testified that when he heard the shots he jumped up and looked out the window and that Debra was behind him. Debra, although denying having any memory of what she saw, acknowledged that she looked out the window immediately after hearing the shots. Turner testified that Debra "yelled out, Darnell and Levi." (Watkins and Williams). This testimony came in without objection from Watkins and over the hearsay objection of the defendant Williams. The evidence was clearly admissible under the "excited utterance" exception to the hearsay rule. *See Teague v. State,* (1978) 269 Ind. 103, 111, 379 N.E.2d 418, 422; *Ferrier v. State,* (1977) 266 Ind. 117, 124–25, 361 N.E.2d 150, 154–55; *Walker v. State,* (1976) 265 Ind. 8, 10, 349 N.E.2d 161, 163–64, *cert. denied,* (1976) 429 U.S. 943, 97 S.Ct. 363, 50 L.Ed.2d 313.

Later in the evening of October 8th, the date of the homicide, Debra gave her first statement to the police; but, standing alone, it was not inculpatory of Watkins.

On October 14th, Debra gave a second statement to the police. On this occasion she implicated all four defendants, including Watkins, whom she said was at the scene and holding a shotgun. She also said that she saw him and Warner run to the alley. In her previous statement she had said that she had seen Warner and "another boy" and that they ran to the alley. She also said that she was then identifying all four assailants because Fred Turner had asked her to do so.

Both of the aforesaid statements were admitted as substantive evidence. On January 9, 1978, Debra was deposed. Her deposition was also offered to contradict her in court testimony that she had remembered nothing she saw when she looked out the window. Only that portion of the deposition that so operated was admitted, and it reflected that when deposed, she stated that she saw both Warner and Watkins firing guns.

Watkins does not argue that any of the aforementioned statements were improperly admitted or that they were not entitled to be considered as substantive evidence upon the guilt issue. Rather, he argues that the evidence derived from Debra is not of such quality—substantial and probative—as to support the finding that Watkins was among the assassins, because of the conflicts in her various versions of the incident. He posits that no reasonable man could select any one of her stories and rely upon it to the exclusion of any other and cites the cases of *Gaddis v. State*, (1969) 253 Ind. 73, 251 N.E.2d 658, *Lottie v. State*, (1974) 262 Ind. 124, 311 N.E.2d 800 and *Baker v. State*, (1956) 236 Ind. 55, 138 N.E.2d 641, but we do not find them to be compelling.

Gaddis is similar to the case before us in that the only witness to identify him was so vacillant in his statements as to render his testimony highly suspect. He had identified the appellant, in the presence of policemen, at the scene of the crime approximately one hour following its commission. At trial, he said that "he looked like the man" and that he had been "too shook up and rattled that night" to say for sure. 253 Ind. at 77, 251 N.E.2d at 660. He also testified that the police had threatened that he would be sent to the penitentiary if he did not testify against Gaddis and that Gaddis had also threatened him. However, in holding that the evidence was insufficient, we noted the absence of any circumstantial evidence supporting Gaddis' guilt and the fact that uncertainty pervaded all evidence derived from the witness. Those are not the circumstances that confronted the jury in the case before us. Although Debra's statements were inconsistent and contradictory, an inference could be fairly drawn from all the circumstances that she had seen the event and had recall concerning it, whereas in *Gaddis* such an inference could not be fairly drawn. Accepting such inference, the question for the jury was, when was Debra lying and when was she telling the truth or half truths.

First, it must be acknowledged that Debra Cunningham knew the defendants. She so testified at the trial and we infer from this that she knew them by sight and by name at the time of the murder. Second, immediately following the shooting, she looked out the window and, with a clear view of the scene, exclaimed, "Darnell and Levi" (Watkins and Williams). This is particularly significant, because it came before there was time for reflective thought and fabrication. Such responses have been termed "excited utterances" and characterized as the event speaking through the witness' involuntary responses. They are regarded as having a high degree of reliability and, for this reason, are admissible and probative, notwithstanding their hearsay characteristics.

Third, Debra's October 8th statement does not conflict with or contradict her October 14th statement. Although we might expect that she would have told all that she knew of the incident on the occasion of the 8th, on its face, the statement does not proclaim it. She said that she saw Warner fire a pistol and that she saw him and "another boy in blue jeans", whom she did not identify, run towards the alley. She was not asked, and she did not say, whether these two were the only ones that she saw or whether or not she knew the boy whom she had seen run away with Warner. Hence, the October 14th statement can be viewed as completing the story begun on the 8th.

In *Lottie v. State*, (1974) 262 Ind. 124, 311 N.E.2d 800, we reversed the judgment of the trial court (Arterburn, C.J., and Givan, J. dissenting) because the identifying testimony was speculative and conjectural. The

sole identifying witness, herself, would not be more assertive than to say, while observing the accused at trial, that he appeared to be three or four inches taller than the person who had robbed her, and that his mouth looked a little different, " * * * in my opinion * * * it is the same man;" " * * * he does appear to be the same individual." and " * * * the eyes and nose looks to me like the same individual." *Id.* at 128, 311 N.E.2d at 802. The only circumstantial evidence supportive of the identification was that the person who had robbed the witness had had a toothpick in his mouth and that the accused had been seen with a toothpick in his mouth twenty minutes earlier at a place from which he could have traveled during the elapsed time. We said in Lottie that the evidence "tends to support a conclusion of guilt, but it does not rise to the minimum standards set forth in *Baker v. State*," 236 Ind. 55, 138 N.E.2d 641 and other cases there cited. *Id.* at 129, 311 N.E.2d at 803.

Watkins has also relied upon *Baker v. State, supra,* in support of his argument that the evidence was not substantial evidence of probative value from which a reasonable man could conclude, beyond a reasonable doubt, that he was one of the perpetrators of the crime charged. The following quoted passages from *Baker* bear repeating

"In considering the standard by which we review the evidence where it is challenged as being insufficient to sustain a verdict or finding, this court has often said there must be substantial evidence of probative value before we can decide an accused has been proved guilty beyond a reasonable doubt. 'This last rule places the evidence before the court on appeal, not for the purpose of weighing it, or for the purpose of determining the facts when there is actual conflict, but for the purpose of deciding, as a question of law, whether or not there is substantive evidence in support of the required material facts essential to a conviction. It is not enough to sustain a conviction that the evidence, when given full faith and credit, may warrant a suspicion or amount to a scintilla.'"

" '... We use the word "substantial" as meaning more than "seeming or imaginary" ' "

"The rule of law defining proof beyond a reasonable doubt has been well settled for many years and requires each juror to be so convinced by the evidence that as a prudent man he would feel safe to act upon such conviction in matters of the highest concern and importance to his own dearest and most important interests, under circumstances where there was no compulsion or coercion upon him to act at all. The standard of a prudent man is that of a reasonable man. If different persons might reasonably arrive at different conclusions from that reached by the trial jury, the verdict will not be set aside for that reason. On the other hand if no reasonable man could find the evidence has proved an accused guilty beyond a reasonable doubt, a verdict would not be sustained by sufficient evidence."

"In the leading case of *State v. Gregory* (1936), 339 Mo. 133, 143, 96 S.W.2d 47, the court analyzed the rule on review to be as follows: 'Now since the test of substantial evidence is whether a jury reasonably could find the issue thereon, the result must depend in some measure upon the degree of persuasion required. In a criminal case liberty and sometimes life are involved, and there cannot be a conviction except upon a finding of guilt beyond a reasonable doubt. Necessarily, therefore, it becomes the duty of an appellate court as a matter of law to decide whether the evidence was sufficient to induce a belief of the defendant's guilt beyond a reasonable doubt in the minds of jurors of average reason and intelligence. And in resolving that question the court undoubtedly can pass on the credibility of the testimony to the extent of determining whether it was substantial in the sense above explained.' " (Citations omitted). Id. at 60, 61, 62, 138 N.E.2d at 644, 644–45, 645.

We hold to the standards above expressed, but they do not command a rever-

sal of the judgment against Watkins. In *Baker,* the erratic witness identified the accused at the trial and had done so at the police station shortly after his arrest. In the meantime, however, she had told the accused and his wife, in the presence of her own husband, that she could not possibly identify her assailant, and the accused's wife and another established an alibi for him. The *Baker* court observed that such evidence stood unimpeached and uncontradicted.

While there are similarities between *Baker* and the case before us, there are also important distinctions. Watkins stood upon his motion for a directed verdict at the close of the State's case and offered no defense evidence. Thus he relied upon his assessment of the State's evidence as being insufficient, as a matter of law. The *Baker* witness had been incriminating of him while in the presence of the authorities but not in their absence, suggesting that she may have been susceptible to what she perceived was expected of her; and there had been no "excited utterance" or other evidence supportive of her identification. In this regard, we acknowledge, as pointed out by Watkins, that the value of the excited utterance identification by Debra rests upon her own credibility and upon that of Fred Turner whose credibility was also suspect, in view of some inconsistencies in his testimony and conflicts between it and a prior out of court statement. However, such inconsistencies and conflicts were not so abject as to render his testimony inherently unbelievable. His credibility, therefore, was a matter for the jury to determine.

We observe that Watkins has been vigorous, and rightly so, in his attack upon the value of identification evidence that is dependent upon Debra's credibility, because of the inconsistencies in her out of court statements and conflicts between such statements and her testimony at the trial.

An additional consideration worthy to be weighed in the balance is that the portion of Debra's deposition that went into evidence revealed that she identified Watkins as one of the assailants. This statement had been made under oath and was subject to cross examination at the time it was made and was in evidence without objection from Watkins or Warner and without any request for a limiting instruction having been made. (*See California v. Green,* (1970) 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489.) Statements of October 8th and 14th, insofar as these two defendants are concerned, are corroborative of the statement from the deposition.

■ As previously observed Debra's statements of October 8th and 14th are not necessarily conflicting. Her depositional testimony cannot be entirely reconciled with her October 14th statement, but in each she identified Warner and Watkins. The circumstantial evidence is entirely consistent with Debra's October 14th statement and her deposition and warranted the jury in crediting those statements and discrediting her in court testimony. These features clearly distinguish Watkin's case from *Gaddis, supra, Lottie, supra,* and *Baker, supra;* and we hold that the evidence of identification of Watkins was substantial and probative and therefore, as a matter of law, sufficient to sustain the verdict.

### As To The Defendant, Smith

Smith has assigned four errors which we shall address in the order stated:

(1) Was the evidence sufficient, as a matter of law, to sustain the verdict?

(2) Was identification testimony improperly admitted at trial over objection that it was fatally tainted by impermissibly suggestive pre-trial identification procedures?

(3) Did the trial court err in denying a verified motion for a continuance?

(4) Did the trial court err in admitting, as substantive evidence, two hearsay statements into evidence?

### Smith Issue I

Our hereinbefore quoted passages from *Baker v. State, supra,* set forth our standard of review on sufficiency of the evidence issues and explain what is meant by

"substantial evidence of probative value." Smith contends that the evidence identifying him as one of the assailants was insufficient, under such standards, in that it came only from Debra Cunningham and Kenneth Hope. He charges that the evidence from Debra is without probative value, but we reject his argument, as it is, in essence, the same as that addressed to us by the defendant, Watkins.

■ Smith also contends that the testimony of Kenneth Hope which identified him as one of the assailants could not be weighed because it was, "at best equivocal." Our examination of the record reveals nothing equivocal about it. In support of his claim that Hope's testimony identifying him was inherently unreliable, Smith alludes to testimony brought forth at the hearing upon his motion to correct errors, but, in determining the issues before us, we are not concerned with that but only with the evidence that was before the jury.

■ The evidence adduced from the witness, Hope, standing alone, was sufficient as a matter of law, to support a finding that Smith was one of the assailants, and it reinforces the evidence adduced through the October 14th statement of Debra Cunningham.

### Smith Issue II

■ Smith claims that the in court identification of him by Hope was fatally tainted by an impermissibly suggestive pretrial photographic display. We will not address this argument, as the claim was not presented at trial. *Pinkerton v. State,* (1972) 258 Ind. 610, 624, 283 N.E.2d 376, 384; *Rennert v. State,* (1975) 263 Ind. 274, 278, 329 N.E.2d 595, 598–99; *Barnes v. State,* (1971) 255 Ind. 674, 675, 266 N.E.2d 617, 618.

At the time the witness identified Smith, counsel was asked if he had any objection, and he responded: "Yes, I make objection in reference to his testimony. I renew my objection at this time." These remarks referred to a prior objection to the witness' relating what he had said to another person

and counsel's objection to its admission as being hearsay. The objection was properly overruled. No objection whatever was made upon the grounds that the testimony was tainted.

### Smith Issue III

Smith claims that reversible error was committed by the trial court in that it denied his verified motion for a sixty day continuance filed four days prior to the date set for trial. The purposes alleged for seeking such continuance were (1) to enable him to depose several persons, named upon the State's list of witnesses, (2) to locate, interrogate and possibly to display one Jack Dobie, who allegedly resembled Smith in appearance and for whom Smith believed he had been mistaken when identified as a participant in the ambush, and (3) to inspect the minutes of the grand jury.

■ Smith's motion was premised, in part upon statutory grounds, Ind.Code § 35–1–26–1 (Burns 1979), and in part upon others. It was not filed until four (4) days prior to the date set for trial, March 13, 1978, and contained no averments compelling the conclusion that it was, nevertheless, filed timely under the circumstance. The motion was, therefore, addressed entirely to the discretion of the trial court. *McGraw v. State,* (1981) Ind., 426 N.E.2d 1290, 1291.

With respect to the witness that Smith alleged he wished to locate and depose, the motion alleged that one Jones had been listed as a witness for the State but that his address had not been revealed by it and that such address had not been ascertained until that date (the day immediately prior to the filing of the motion). There was no allegation that the State was aware of Jones' whereabouts and no allegations with respect to what efforts Smith or his counsel had made to locate him. Neither did the motion contain any specific allegations of the evidence that would be derived from interrogating this person.

The motion also alleged that Dobie had also been listed as a State's witness, without disclosure of his whereabouts, and that both the prosecutor and the police had de-

nied having knowledge of his whereabouts. No allegations of any efforts having been made to locate Dobie, other than by inquiring of the prosecutor and the police, were contained in the motion, nor was anything alleged that would have given rise to an expectancy of locating such person.

The motion further alleged that State's witnesses Harriett Smith and Rose Smith had been subpoenaed to appear and give depositions on January 12th, and had failed to appear. However there was no allegation made with respect to what efforts, if any, had been employed, subsequent to January 12th, to interrogate or depose these witnesses.

It was also alleged that the State had added three names to its list of witnesses on March 7th, only six days prior to the trial date. These witnesses were a Dr. Bronko, a Dr. Levin and police officer Stack. There was no allegation that counsel would, with due diligence, be unable to interrogate these persons. We note, further, that of these people, only Dr. Levin actually testified and that he testified only with respect to the cause of decedent's death.

With respect to the minutes of the Grand Jury, the motion alleged that it was necessary to inspect them and that, as of the date of such motion, the prosecutor had advised that they had not yet been typewritten. There was no assertion that Smith had made any prior attempt to examine the minutes or that the prosecutor had been uncooperative in this regard.

■ In view of the motion's failure to reflect the exercise of due diligence, the probability of locating the witnesses within a reasonable time, that the State had thwarted Smith's investigation or been uncooperative or, except as to Dobie, the materiality of any evidence sought, it cannot be said that the court abused its discretion in denying the requested continuance. *See King v. State,* (1973) 260 Ind. 422, 425–26, 296 N.E.2d 113, 115; *Jacobs v. State,* (1982) Ind.App., 436 N.E.2d 1176, 1178.

*Smith Issue IV*

Smith next contends that the trial court erred in admitting Debra Cunningham's out-of-court statements of October 8th and 14th into evidence, which the court admitted and permitted to be considered as substantive evidence upon the authority of *Patterson v. State,* (1975) 263 Ind. 55, 324 N.E.2d 482.

As previously mentioned, Debra gave statements to the police on October 8th (Exhibit No. 7) and October 14th (Exhibit No. 6). It is Smith's contention that the foundations required for admitting these statements as substantive evidence had not been met and further that they had been obtained by coercion.

Much of Smith's argument with respect to admissibility of these statements utilizes the testimony of Debra concerning the October 8th statement. However, in that statement, she had implicated only Warner and some unidentified boy. The admission of that statement, therefore, could not have harmed Smith. Consequently, we will confine our discussion of this "Patterson" issue to evidence respecting the admissibility of the October 14th statement wherein she implicated Smith.

The Patterson exception to the hearsay rule is justifiable because it permits the admission, on occasions, of major testimonial evidence of guilt that otherwise would be lost simply because it had not been subject to cross examination at the time of its utterance, notwithstanding that it was subject to cross examination at trial. *Stone v. State,* (1978) 268 Ind. 672, 377 N.E.2d 1372. Its misapplication and abuse have been noted in *Samuels v. State,* (1978) 267 Ind. 676, 678–79, 372 N.E.2d 1186, 1187, ("To the extent that it has been used to support the admission of out-of-court statements as a mere substitute for available in-court testimony, it has been misapplied.") and in *Carter v. State,* (1980) Ind.App., 412 N.E.2d 825, 828–31, ("We conclude that the trial court erred in permitting Officer Crawford to relate Irey Hughes' post-arrest statements before Hughes acknowledged making the statements.") and ("under our interpre-

tation of the Patterson rule, denied or unrecalled statements are inadmissible *as substantive evidence*.") (Emphasis added.) It was correctly observed in *D.H. v. J.H.,* (1981 Ind.App.), 418 N.E.2d 286, 294–95:

> "The Patterson rule has been defined recently in *Smith v. State,* (1980) Ind. App., 400 N.E.2d 1137, 1141:
>
>> 'Briefly stated, the Patterson rule is that a prior statement of a witness is admissible, not only for purposes of impeachment, but also as substantive evidence, provided the out-of-court asserter is present at trial for cross-examination.' (Citations omitted, original emphasis.)
>
> "However, we do not believe the rule to be as broad as might be indicated in that definition, if by this definition nothing more is required than the mere presence of the out-of-court declarant. We have reviewed a number of cases wherein the Patterson rule was relied upon and find the common factor in those cases was that the out-of-court declarant had in fact testified and been subjected to cross-examination."

■ We agree with Smith's position that when the witness (out-of-court declarant) denies having made the statement in question or denies having any memory of having done so, the statement is inadmissible *as substantive evidence*, because it obviously cannot be then cross-examined. However, although her testimony might be interpreted as such a denial, in part, or a claim of no recollection, in part, that conclusion is not compelled. Whether or not Debra denied having given the October 14th Statement or professed no memory of having done so or whether she admitted giving it had to be determined by the trial court judge, from all of her testimony and not merely from isolated bits and pieces. It is apparent, from the entire record of her testimony, that the trial court did not err when he said: "Gentlemen, she admitted making those statements, she has authenticated them." Tr. p. 326. and "I'll hear nothing further after this. The witness before denied having made the statement,

counsel, so impeachment may have been proper at that time. But today, now she has admitted making these statements on that day, so again they are admissible." Tr. p. 337. Although Debra, in response to some questions with respect to certain of the declarations contained in the statement had memory lapses or issued denials, a fair interpretation from all of her testimony was that she was professing no memory of the events or was denying that she had observed them rather than questioning or denying that she had made the declaration in question. At one point in cross examination by Smith's counsel, Debra did categorically deny having said that she had seen Smith at the scene of the crime, a declaration contained in the October 14th statement, and testified that the interrogating officer had tried to get her to say that but that she never did. Tr. p. 391. Were this the only evidence upon that issue, that portion of the statement would have been admissible for impeachment purposes only, as cross examination would have been impossible. However, she had previously testified, after examining the entire statement, that she had given it to the police.

"Q. You did make the statement?
(Referring to October 8th statement.)
"A. Yes I did at that time.
"Q. And you also made this one, State's Exhibit 6?
(October 14th statement.)
"A. Yes, I did." Tr. p. 323.

She had also acknowledged her signature at the bottom of each statement. Tr. p. 322, 323. Thus, to some extent, Debra gave conflicting testimony upon the issue of whether or not she had made the statement that she had seen the four defendants, including Smith. These conflicts were to be resolved by the trial judge in determining whether or not that pertinent portion of the statement was admissible as substantive evidence.

Smith has also challenged the admissibility of Debra's out of court statement upon the basis that she had been coerced into giving it by Turner and Sebastyen, the interrogating police officer. We have hereto-

fore held that *Patterson* exception statements were admissible as substantive evidence, notwithstanding that the declarant repudiated them and that the reason given, during the repudiation, for having made them initially went only to the credibility of the conflicting statements. *Cook v. State,* (1978) 269 Ind. 227, 228–29, 379 N.E.2d 965, 966; *Moten v. State,* (1978) 269 Ind. 309, 312–13, 380 N.E.2d 544, 546. *Foor v. State,* (1977) 172 Ind.App. 618, 622–23, 360 N.E.2d 1273, 1275.

█ It should be noted that portions of the October 14th statement were not admitted into evidence, i.e., they were deleted from the exhibit prior to its being read to the jury, because admission of such portions were subject to other bona fide objections. *Smith v. State,* (1980) Ind.App., 400 N.E.2d 1137, 1141. To the extent that the statement was admitted, it was admissible as substantive evidence and there was no error. Debra was available for cross examination. She had been interrogated concerning the subject matter that was contained in the out of court statement. The subject matter was relevant; and, although she may have denied having made certain of the statements or may have professed no memory of having done so, there was sufficient evidence from which the trial judge could properly conclude that she, in fact, had made them and remembered having done so. She was, therefore, presumably susceptible to cross examination upon the matters asserted in the statements.

### As To The Defendant, Warner

Warner has assigned the following nine errors:

(1) Did the court err in precluding interrogation on cross examination of a State's witness which, it is argued, may have brought forth testimony reflecting adversely upon the witness' credibility?

(2) Did the court err in admitting two prior, out-of-court statements of Debra Cunningham, as substantive evidence?

(3) Did the court err in admitting evidence of Warner's prior criminal act?

(4) Did the court err in refusing to admonish the jury to disregard a question and answer that were the foundation for an impeachment upon a collateral matter?

(5) Did the alleged errors relative to the above mentioned assignments, if harmless individually, operate cumulatively to deny Warner a fair trial upon the merits?

(6) Was the verdict, as to Warner, sustained by the evidence?

(7) Did the court err in not ruling upon a motion for a mistrial predicated upon surprise?

(8) Did the court err in requiring Warner to leave the courtroom during a portion of the proceedings?

(9) Was the sentence imposed upon Warner excessive?

### Warner Issue I

Ronnie Boone, who had been in the parked automobile with decedent when he was killed, testified as a witness for the State. In cross examination, Warner's counsel proposed to ask him if he were "on drugs", and the court ruled that the question could not be asked on cross examination; although it would be permitted as part of the defendant's case-in-chief. Warner hypothesizes that in view of other evidence, the question, if permitted, would have brought forth evidence reflecting adversely upon the witness' credibility.

█ The trial court has broad discretion in controlling the scope of cross examination. *Murphy v. State,* (1977) 267 Ind. 184, 194, 369 N.E.2d 411, 416. The question clearly was not within the scope of direct examination, and we see no abuse of discretion simply because the witness' credibility was not made subject to attack at that time. The issue, however, is here determined by Warner's inability to show how he was harmed. He was not precluded from pursuing the question at a later stage of the proceedings. Inasmuch as the question was outside the scope of direct examination, the witness would have been Warner's witness with respect to that question, even if asked upon cross examination. No offer to prove

what the answer would have been, had the question been permitted, was made, hence there can be nothing in the record to indicate that Warner was harmed by the ruling. *Gurley v. State,* (1976) 264 Ind. 552, 557, 348 N.E.2d 16, 20.

### Warner Issue II

Warner was implicated as one of the assailants through the previously mentioned Patterson statements given to the police by Debra Cunningham and admitted as substantive evidence. His arguments with respect to their having been erroneously admitted for substantive purposes parallel those presented by the defendant Smith, i.e., they were not subject to cross examination and were highly questionable because made under duress. We have responded to these arguments under that portion of this opinion addressed to *Smith Issue IV,* and for the reasons therein expressed, we hold that there was no error in admitting the statements as substantive evidence.

The admissibility of Debra's October 8, 1977 statement was not addressed under *Smith Issue IV,* because he had not been therein implicated. That statement, however, was also admissible as substantive evidence for the same reason that the October 14th statement was so admissible. A fair inference, from all of Debra's testimony, was that she admitted having made the statement. That was the basis upon which the trial court admitted the evidence, and he was justified in doing so. "Gentlemen, she admitted making those statements she has authenticated them." That remark came from the trial judge and referred to both the October 8th and the October 14th statements. Tr. p. 326.

■■■ Neither do we find merit in Warner's additional contention that unwarranted emphasis was placed upon the statements by the manner in which they were placed in evidence. It was necessary for the prosecutor to interrogate Debra concerning the statements in order to to lay the foundation for their introduction; and it was proper for the court to read them to the jury, following the ruling that they were admissible, as this was the manner by which their content was presented to the jury. Until that was done, it was not in evidence.

### Warner Issue III

■■■ As herein before related, Warner and Turner were rivals for the affections of Debra Cunningham. Warner was the father of her three year old child, and Turner was her current suitor. On October 5th, three days prior to the homicide, Warner had appeared at the Cunningham house while Turner was there. They argued outside the house and Warner drew a handgun and fired it in Turner's direction. Evidence of this incident was permitted to be presented over Warner's objection that it reflected a separate and distinct offense. Warner argues that there was not a sufficient basis for admitting the evidence under the exception to the general rule which permits the introduction of such evidence to prove intent, motive, purpose, identification or common plan. However, there was credible evidence that Turner and the decedent resembled each other, were frequently together and that the decedent often wore Turner's clothing and was wearing his jacket on the day he was killed; and it was the State's theory that the decedent may have been mistaken for Turner when he was shot. Warner points to conflicts in the evidence supportive of such theory and argues that such evidence should not have been admitted without a more persuasive case for the theory having first been made. However, the admission of such evidence was a matter within the discretion of the trial judge. Although the evidence was not compelling, it did permit a reasonable man to draw the inference that the decedent resembled Turner. Given that inference, the evidence of the October 5th event was relevant to the issue of motive and intent, hence admissible, as it demonstrated the hostile relationship of the parties. *See Pettit v. State,* (1979) Ind., 396 N.E.2d 126; *Cobbs v. State,* (1975) 264 Ind. 60, 338 N.E.2d 632.

### Warner Issue IV

Debra Cunningham testified, in response to interrogation by Warner's counsel, that Warner had never threatened her prior to October 8, 1978. On cross examination by the State, she was asked if she had, in August 1977, complained to the police that Warner had threatened her, and she denied having done so. Counsel moved the court to admonish the jury to disregard the question and answer, which motion was denied, upon the prosecutor's representation that he would bring forth evidence that she had made such report.

■ Warner argues, on appeal, that the ruling was erroneous "since the question clearly contemplated impeachment of the witness on a collateral matter." Warner also complains that the State did not thereafter present evidence that Debra had made the report. We do not see how Warner was harmed with respect to this assignment. The foundational question was answered in the negative, and the impeachment evidence was never brought forth; hence the information produced for the jury's consumption was not inconsistent with Debra's prior testimony. It could almost be said that it was a reaffirmation of it, i.e., that Warner had not threatened her.

### Warner Issue V

Apparently anticipating that we would determine that his alleged errors considered hereinbefore under his Issues I, II, III and IV were harmless, Warner argues that they had a cumulative effect which was harmful, in that he was not fairly tried on the merits. The argument, however, presupposes that cumulative errors had been committed, which is not the case. With respect to his Issues II and III, we found no error. With respect to his Issue I we found that there had been no abuse of discretion but that, assuming error, Warner had, nevertheless, failed to show harm.

Finally, with respect to his Issue IV, we saw no need to address the error assigned, as Warner demonstrated no harm emanating from it, and we perceived none. The argument is predicated upon an accumulation of errors, but we do not find such accumulation.

### Warner Issue VI

■ Warner's argument addressed to the sufficiency of the evidence also presupposes a favorable determination upon the issue of the admissibility of Debra Cunningham's prior out-of-court statements, which determination has not been forthcoming. Even without such evidence, however, the evidence of Warner's guilt was sufficient.

■ In addition to the incriminating information contained in Debra's statements, Warner was placed at the scene of the crime firing a gun. This evidence came from both Turner and Hope. Warner argues that the testimony of these witnesses was unreliable because their opportunities to identify him were limited and they had motive for testifying falsely. However, these considerations relate only to the credibility of the witnesses and the weight to be given to their testimony. These are the province of the trier of fact, and their determination will not be disturbed on appeal. *E.g., Thomas v. State,* (1982) Ind., 436 N.E.2d 1109, 1111; *Powers v. State,* (1982) Ind., 431 N.E.2d 799, 801; *Bryant v. State,* (1972) 257 Ind. 679, 278 N.E.2d 576.

### Warner Issue VII

Following Debra's repudiation of her out of court statements incriminating Warner and her testimony that she had given false statements because she was being coerced by Turner and others, Warner moved for a mistrial, and the judge deferred ruling upon the motion. Warner argued then as he does now, that by reason of his having no prior knowledge of such claims, he had been precluded from making proper preparation to buttress Debra's testimony.

■ Error cannot be assigned to a court's failure to rule upon a motion. "In such an instance (failure to rule) it cannot be assumed that the motion was denied, and by proceeding without a ruling and without protest, the defendant has waived any alleged error." *Minton v. State,* (1978) 269

**964**

Ind. 39, 378 N.E.2d 639; *Chustak, et al. v. Northern Indiana Public Service Co.,* (1972) 259 Ind. 390, 288 N.E.2d 149.

 We acknowledge that the court took the mistrial motion under advisement and, therefore, should have subsequently ruled upon it. However, if Warner continued to believe that he was entitled to have a mistrial declared, after serious reflection upon the matter, it was incumbent upon him to reassert the motion. It is obvious, however, that the motion should have been overruled. The grant of a mistrial is a dire action and should be resorted to only when no other remedy will rectify the situation complained of. Even if Warner's trial preparation had been thwarted, as he claims was the case, the appropriate remedy was a continuance or recess. *Minton v. State, supra; Block v. State,* (1976) 265 Ind. 569, 356 N.E.2d 683. Only by showing that the grant of a continuance would not serve the emergency need, would there have been any basis for declaring a mistrial.

Additionally, we cannot but note that it is difficult to comprehend how Warner could have been anything but aided by Debra's testimony notwithstanding that it came as a surprise. It not only was a repudiation of her prior incrimination of him but was also very damaging to Turner's credibility, and he claimed to be an eye witness. She was adamant in her in trial repudiation and scorn for Turner.

### Warner Issue VIII

While Debra Cunningham was testifying, the court perceived, from her actions, that she might be testifying under intimidation. Thereupon, the jury was excused, and the gallery and the defendants were required to leave the courtroom. The court then, with all counsel present, proceeded to interrogate Debra concerning her emotional disarray. She was also questioned as to whether or not anybody in the courtroom had threatened her or was then intimidating her. Warner now contends that his Sixth Amendment rights were violated by this procedure.

We have heretofore determined that a defendant's constitutional right to be present did not apply with respect to proceedings that did not require the presence of the jury. *Harris v. State,* (1967) 249 Ind. 681, 688, 231 N.E.2d 800. The jury was not present and no testimony was produced during the defendant's absence. Hence no error was committed.

### Warner Issue IX

Warner argues that the sixty year sentence imposed upon him was excessive in view of his youth (age 22 at the time the crime was committed) and his record of having no prior felony conviction. He asks that his sentence be reduced to the basic or presumptive forty years fixed by statute.

The record reveals that the defendant participated in a deliberate cold-blooded ambush in which one person was killed, another severely injured and another barely escaped. The evidence supports the trial judge's finding that the crime reflected an utter disregard for human life and that two persons, in addition to the decedent, were likely to have been killed. It cannot be said that the sentence is manifestly unreasonable, as required by Ind.R.App.Rev.Sen. 2 to authorize our intervention.

We find no reversible error; the judgments of the trial court are affirmed.

GIVAN, C.J., and DeBRULER and HUNTER, JJ., concur.

PIVARNIK, J., not participating.