Paul KOMYATTI, Jr., and Rosemary Komyatti, Appellants,

v.

STATE of Indiana, Appellee.

No. 584S203.

Supreme Court of Indiana.

March 25, 1986.

Rehearing Denied May 14, 1986.

Andrew R. Tanzillo, Hammond, for Rosemary Komyatti.

Rhett L. Tauber, Perry Theodoros, Theodoros, Anderson & Tauber, P.C., Merrillville, for Paul Komyatti, Jr.

Linley E. Pearson, Atty. Gen., Lee Cloyd, Deputy Atty. Gen., Indianapolis, for appellee.

PIVARNIK, Justice.

Defendants-Appellants Paul Komyatti, Jr., and Rosemary Komyatti were convict-

ed of murder and conspiracy to commit murder, a class A felony, on December 7, 1983 at the conclusion of a jury trial in the Lake County Superior Court. On December 28, 1983 Paul Jr. (Paul) was sentenced to fifty-five (55) years for murder and forty-five (45) years for conspiracy to commit murder, to run concurrently. On the same day Rosemary was sentenced to fifty-five (55) years for murder and forty-five (45) years for conspiracy to commit murder, to run consecutively. The trial of both defendants being consolidated, the direct appeal of both now appears before us and raises the following issues:

1. limitation of examination of Mariann Vandiver;

2. denial of mistrial based on prosecutor's failure to disclose exculpatory evidence;

3. failure to grant a continuance upon State's witness Dr. Michael Kaplis' testimony;

4. denial of Appellants' requests to reopen their case-in-chief;

5. sufficiency of the evidence;

6. failure to overrule the State's hearsay objection during the testimony of Richard Komyatte;

7. admission of certain photographs into evidence; and

8. improper sentencing of Rosemary Komyatti.

The evidence most favorable to the State shows Paul Komyatti, Sr., was a strict and domineering father and husband. In February, 1983 he lived in his Hammond home with his wife, Rosemary; son, Paul; and grandson, Jason. Jason's mother, Mariann Vandiver, the daughter of Paul Sr., returned home in early February, 1983. Jason had been staying with the Komyatti family because Mariann and her husband, Bill Vandiver, were out of money and on the run from the Chicago police. In mid-February Paul and Mariann discussed the possibility of killing their father. When they approached Rosemary regarding the subject, she indicated she was aware of their conversation. She did not object to the idea, but only suggested it be done away from the house. When Bill Vandiver returned to Hammond, Mariann approached him for his help in killing her father. About this time Mariann moved out of the Komyatti residence and into a girlfriend's house with her husband. From early February until March 19, 1983, conversations continued regarding various plots to kill Paul Sr.

The initial plot to kill Paul Sr., was for him to be shot outside a tavern, creating the appearance of a robbery. No person could be found to do this, and Bill declined to take such action out in the open. Since Paul Sr., took numerous medications for a variety of illnesses, the first actual attempt on his life was by way of poisoning him. Rosemary purchased nitroglycerine from the pharmacy where she worked and gave it to Paul along with his father's medication. Bill and Paul substituted nitroglycerine for the medication, in hopes of causing a heart attack. The next day Rosemary told Mariann that Paul Sr., had nausea, dizziness, vomiting, and headaches, but that he did not die.

When the prescription for nitroglycerine ran out a similar method of poisoning was attempted, substituting rat poison for medication. Bill or Paul purchased the rat poison. Again, Paul brought the medication to Bill, who substituted it with the poison and gave it back to Paul to give to Rosemary. Rosemary reported to Mariann over the next couple of days that Paul Sr., became ill. When he spoke about going to a doctor the rat poison was discontinued for fear a physician would detect it.

Pursuant to the next attempt on the life of Paul Sr., Bill and Mariann bought a syringe and vial of liquid poison. They delivered the syringe and vial to Rosemary at her place of employment and instructed her on how to use it. The next day Rosemary told Mariann she had put the poison in her husband's coffee, but it had no effect.

In yet another attempt on the life of Paul Sr., Rosemary purchased more nitroglycerine. As before, she gave it to Paul along

with his father's medication. Paul, in turn, took it to Bill for the substitution. After the switch was made Paul returned the medication to Rosemary. Before he could ingest the poison, however, Paul Sr., became ill from his dinner. Consequently, it is questionable whether he took his medication that evening. Regardless, the attempt was again unsuccessful.

Next, Bill and Paul decided that Rosemary would render Paul Sr., unconscious with ether, and Bill would use a syringe to inject an air bubble into one of Paul Sr.'s veins. This plan was abandoned because on the night it was to occur Mariann's son was sleeping with Paul Sr. Bill and Mariann left for Georgia that night, intending to have no further part in the attempts to kill Paul Sr. When they arrived in Louisville the following morning, Mariann called Rosemary. Rosemary was upset because Paul Sr. was threatening to check her purchases charged at her place of employment. She was afraid he would discover some purchases for Mariann, and that she had loaned Mariann some money. Bill and Mariann decided to return to Hammond once more after Rosemary talked to Bill and told him something had to be done.

That night Rosemary contacted Bill and Mariann at their hotel and told them Paul Sr. was yelling, swinging a belt at his son, and threatening to cause trouble at his school and at her place of employment. Paul got on the telephone and insisted something be done that night. Once again the four planned to inject air into one of Paul Sr.'s veins. At approximately 1:00 a.m. on March 20, 1983, Bill and Mariann entered the house upon Paul's signal to do so. Bill and Paul went to Paul Sr.'s bedroom. Subsequently Mariann heard sounds of scuffling and Paul Sr. cried out for help. Bill and Paul then came out to the living room and were joined by Rosemary and Mariann. Rosemary suggested they have a drink to celebrate. Bill recounted how there was not enough ether to render Paul Sr. unconscious, so he had tried to knock him out with the butt of his gun. When that failed he stabbed Paul Sr.

a number of times while the younger Paul held him down.

The four decided to tell people Paul Sr. had left suddenly on a fishing trip. While Paul and Bill collected tools and garbage bags with which to dismember and dispose of the body, Rosemary and Mariann gathered the clothes Paul Sr. had worn that evening. Rosemary went through Paul Sr.'s wallet, keeping some credit cards and destroying others. Bill and Paul dismembered the body, placed it in a number of separate garbage bags, and disposed of it along Lake Michigan with other evidence of the crime. Meanwhile, Rosemary and Mariann finished cleaning the bedroom where Paul Sr. was murdered.

I

■ Appellants claim they were denied their constitutional right to cross-examine Mariann Vandiver regarding her prior criminal behavior including but not limited to drug use, prostitution and the circumstances surrounding the incident in which Bill Vandiver shot an individual in Chicago, Illinois. In her testimony for the State Mariann Vandiver implicated the other members of the family in the murder. Appellants contend that evidence of her past activities, if permitted on cross-examination, would disclose that she did these things for money and would further show she had a motive for committing perjury against the defendants, her mother and her brother. It is true that the fact that a witness had a motive to perjure herself or falsify testimony is relevant to the credibility of that witness. *Denton v. State* (1983), Ind., 455 N.E.2d 905, 909. The areas in which cross-examination was limited here concern questioning Mariann about her arrest for possession of drugs which did not result in a conviction, her possession and use of drugs, and her arrest or activity in prostitution also not resulting in a conviction. Appellants claim that had they been allowed to question Mariann in these areas they could have shown a propensity to commit crimes motivated by a need for money, and such would prove a bias to testify here

as well as a motive to murder Paul Sr. The record discloses that the trial court did not foreclose appellants in their cross-examination of Mariann as to her bias and motive. Although certain areas of Mariann's past were not allowed to be addressed, a great deal of evidence and testimony was before the jury which permitted them to consider her bias and motives. Appellant Paul Komyatti concedes evidence was admitted that tended to prove her bias and motive in this regard as follows: Bill and Mariann were fugitives from the Chicago police; Bill and Mariann were unemployed and had no residence; Mariann believed her father had a lot of money and she could easily get money from her mother; Mariann asked for money after her father was killed and, in fact, received money from both her mother and brother after the murder. Further, there was testimony admitted regarding her use of cocaine. Her involvement with drugs was ultimately admitted in connection with her brother's statement to the police. It does not appear, therefore, that Appellants were denied the opportunity to bring evidence of Mariann's drug involvement and her need for money into evidence. There is therefore not a question here of being totally cut off from presenting facts which eroded Mariann's credibility, but rather, rulings by the trial court that tended to limit this area of cross-examination. This Court held that only a total denial of cross-examination on an area concerning a witness' credibility will amount to a constitutional denial of the right to cross-examination. *Rinard v. State* (1979), 271 Ind. 588, 590, 394 N.E.2d 160, 161, *citing Thomas v. State* (1977), 172 Ind.App. 470, 360 N.E.2d 1006; *Brooks v. State* (1973), 259 Ind. 678, 291 N.E.2d 559. *Rinard* further explained that any less than total denial of cross-examination is viewed as within the discretion of the trial court to regulate the scope of cross-examination and will, of course, be reviewed to determine whether there was an abuse of discretion in such denial. *Rinard* also presented a set of facts on which it was observable that a substantial amount of cross-examination was admitted. As we have demonstrated above, a substantial amount of evidence was admitted here by which the jury could have found motive and bias and we find no reversible error in the denial of further cross-examination by the trial judge.

## II

During the trial defense counsel became aware that Mariann Vandiver had been allowed to converse privately with her husband, Bill Vandiver, for approximately thirty minutes immediately after the arrest of both of them and before she made a statement to the police. Mariann Vandiver had already testified in this case at the time that defense counsel learned of this meeting, Friday, December 3, 1983. On Monday, December 6, the defense moved for a mistrial, arguing that the State should have disclosed this during discovery so that it could have been used to impeach Mariann's credibility. Appellants' contention is that since this gave Mariann and Bill an opportunity to concoct a story to implicate the rest of the family and at the same time protect themselves, that it represented exculpatory evidence that the State was bound to furnish in its discovery to Appellants. Prior to trial, the court ordered the prosecutor to provide all discoverable materials to Appellants. In furnishing such discovery, the prosecutor did not advise Appellants that Bill and Mariann were allowed to confer privately and that subsequently they made statements to the police implicating both Rosemary and Paul. Appellants now claim the prosecutor's failure to inform them of the meeting precluded them from questioning Mariann regarding the subject matter of this meeting with Bill and since Appellants did not become aware of the meeting until after Mariann had testified they were entitled to a mistrial.

A trial court has wide discretionary latitude in discovery matters and absent clear error, its rulings will not be overturned. *Hunt v. State* (1983), Ind., 455 N.E.2d 307, 313; *Parrish v. State* (1983), Ind., 453 N.E.2d 234, 238. The trial judge is in the best position to determine what, if

any, harm has been sustained by an alleged non-compliance with the order. *Williamson v. State* (1982), Ind., 436 N.E.2d 90, 92. The trial court in the instant case denied the motion for mistrial, pointing out that the mere fact of a short meeting between the witness and her husband, a co-conspirator, was not fatal to the credibility of the witness. He noted that both parties might have been out on bond and had unlimited opportunity to confer. The evidence was uncontradicted that Bill and Mariann Vandiver had spent quite a bit of time together after the murder and before their arrest in which they had the same opportunity to fabricate a story. The State's duty to disclose a matter in response to a discovery order is measured by whether the evidence is so obviously exculpatory that failure to turn it over is tantamount to denial of a fair trial. *Murray v. State* (1982), Ind., 442 N.E.2d 1012, 1016. The fact that these two parties did confer at this particular time does not demonstrate obviously exculpatory evidence. The facts of this case are not comparable to *Reid v. State* (1978), 267 Ind. 555, 372 N.E.2d 1149, upon which Appellants rely. In *Reid* the State failed to disclose the existence of a witness who would have totally refuted the testimony of the alibi witness, yet we still affirmed the conviction. The evidence at issue here is must less exculpatory and as such, is less deserving of a mistrial. As we held in *Watkins v. State* (1983), Ind., 446 N.E.2d 949, 964, the granting of a mistrial is a dire action and should be resorted to only when no other remedy will rectify the complained of situation. One other possible remedy in the present case would have been a motion for a continuance. Appellants did not so move because they felt such would be useless since Mariann had already testified and been cross-examined. This, of course, did not preclude Appellants from presenting their evidence either by recalling Mariann during their case or by recalling the police officers who were present at the time of the meeting. The trial court did not err in overruling the motion for mistrial.

## III

The State called Michael Lantz, an analyst for Great Lakes Forensic Laboratories, who testified concerning his participation in the autopsy of Paul Sr. He confirmed that he detected neither traces of nitroglycerine nor any poison in the liver of Paul Sr., and that although the liver was decomposed, it was in a state sufficient to test and from which to obtain results. The State subsequently called Lantz's supervisor, Dr. Michael Kaplis, as a witness. Although the State had listed Michael Lantz as a potential witness, it did not list Dr. Michael Kaplis. Kaplis testified that where a liver stands outside the body for a period of time and begins to decompose, the chances of finding poison in it are very, poor unless it is present in large excess. He also testified that as soon as a person is given a drug, time becomes a factor and the drug constantly moves toward elimination. He concluded in the present case it was very possible the drugs would not be detected in Paul Sr.'s liver because of these processes. Appellants objected to the introduction of Kaplis' testimony, arguing that while they had not considered Lantz to be an expert, they did consider Kaplis an expert whose testimony could be refuted only by another expert. The trial court disagreed with the proposition that Lantz was not an expert witness, but ruled that the defense could have time to depose Kaplis before he testified. Appellants, however, refused to acquiesce in the trial court's ruling that a mid-trial deposition was the appropriate remedy and requested that his testimony be stricken and the jury admonished not to consider it. Appellants now argue they should have been granted a continuance in order to procure an expert to rebut Kaplis' testimony. The record shows, however, that Appellants did not move for a continuance. Since Appellants did not specifically request a continuance, the trial court commits no error in failing to grant one. *Burgess v. State* (1984), Ind., 461 N.E.2d 1094, 1099, *reh. denied* (1984); *see also Sidener v. State* (1983), Ind., 446 N.E.2d 965, 968. Even had Appellants

moved for a continuance, however, denial of their motion would not necessarily be error where an alternative remedy was given by the trial court, and more particularly, when the record does not show that Appellants suffered some prejudice from the denial. *Randall v. State* (1983), Ind., 455 N.E.2d 916, 930; *Hardin v. State* (1981), 275 Ind. 63, 66, 414 N.E.2d 570, 573. In *Hardin*, this Court affirmed the trial court's denial of a motion for continuance made when the State confronted Hardin with an expert witness who had not been disclosed in compliance with discovery orders. The denial of the continuance was justified on appeal because Hardin did not demonstrate that a continuance would have enabled him to refute or discredit the testimony of the surprise witness. Here, the testimony of Dr. Kaplis merely rebutted that of Michael Lantz. The record shows that Appellants did, in fact, thoroughly cross-examine Dr. Kaplis. There is no showing that if given the opportunity Appellants would have been able to refute or discredit the testimony of Dr. Kaplis to such an extent that they demonstrate reversible error.

IV

■ Appellants next allege the trial court erred in denying their request to reopen their case-in-chief so as to allow the testimony of Mary McGhee. On December 6, 1983 Mary McGhee appeared to testify but left before doing so because she was ill and had not been subpoenaed. The trial court recessed until the next day. That evening Appellants subpoenaed her to testify at 8:30 a.m. the following day. By 9:00 a.m. McGhee still had not appeared. Appellants moved for a continuance, which was denied. McGhee arrived sometime after the State's closing argument. The trial court denied Appellants' motion to reopen their case. McGhee, a matron at the Lake County Jail, would have testified she overheard Mariann Vandiver tell another inmate she would be "coming into some money" soon, thus contradicting Mariann's testimony that she never had such a conversation. Appellants concede the granting of

permission to reopen a case is within the discretion of the trial court, *Gorman v. State* (1984), Ind., 463 N.E.2d 254, 257, yet maintain the trial court did abuse its discretion because a party should be afforded the opportunity to reopen his case to submit evidence which could have been part of his case-in-chief. *Lewis v. State* (1980), Ind. App., 406 N.E.2d 1226, 1230.

In *Rowe v. State* (1983), Ind., 444 N.E.2d 303, 305, the defendant sought a continuance when one of his witnesses failed to appear, but the trial court denied the motion. In reviewing and upholding that decision we considered, among other things, the fact that one continuance had already been granted due to the same witness' failure to appear. Here, we note Appellants had almost an entire day's recess in which to have McGhee appear. We also note, and agree with the State, that McGhee's testimony would have been mere rebuttal, meant to prove that Mariann Vandiver made a single statement which she denied making. The trial court did not abuse its discretion in denying a second delay in order to allow rebuttal evidence during closing arguments.

V

Appellants next claim their convictions were based on insufficient evidence. They both claim Mariann Vandiver, the State's key witness, was inherently unbelievable. In addition, Paul maintains there was insufficient evidence that he had the requisite intent to commit a felony.

In his brief, Paul recounts Mariann Vandiver's testimony and possible motives, as well as various other facts, in an effort to have this Court reweigh the evidence and judge her credibility. This we will not do. Only when, for some reason, we find a witness' testimony to be inherently unbelievable will we reweigh the evidence. *Bentley v. State* (1981), 275 Ind. 67, 69, 414 N.E.2d 573, 574. Where the sufficiency of evidence is challenged on review this Court will neither weigh the evidence nor judge the credibility of witnesses, but rather, will

look to the evidence most favorable to the State together with all reasonable inferences therefrom. We will then determine if there is substantial evidence of probative value from which the trier of fact might reasonably infer guilt beyond a reasonable doubt. *Harris v. State* (1985), Ind., 480 N.E.2d 932, 937.

Rosemary's argument is that there is a lack of evidence of her participation in the murder and conspiracy. She keys on her absence at certain critical points in time, such as when the poison was substituted for the medicine. Her argument is that there is a lack of evidence of any overt act on her part. A person conspires to commit a felony when, with intent to commit a felony, she agrees with another person to commit the felony. The State must allege and prove that either the person *or the person with whom she agreed* performed an overt act in furtherance of the agreement. Ind.Code § 35–41–5–2 (Burns 1985). Rosemary's argument ignores much evidence proving her participation in both the conspiracy and the murder itself. The evidence shows at least that Rosemary purchased the nitroglycerine, obtained the medicine of Paul Sr., passed them on to the others, received the liquid poison from Bill, administered some of the poisons, helped clean the scene of the murder, and assisted in covering up the murder. Under the standard set forth above from *Harris* we find sufficient evidence upon which to base the convictions. While the testimony in this case was not without conflict, we believe the jury, according to their duty, could have and indeed did resolve those conflicts in favor of guilty verdicts.

## VI

Rosemary Komyatti called as a witness, Richard Komyatte, the family attorney, who testified that in 1974 he wrote wills for the victim, Paul Komyatti, Sr., and Appellant Rosemary, in which each left all of his or her assets to the other and to their children if one predeceased the other. In 1982, however, the victim had the witness write new wills. Under the terms of the victim's new will, his assets would go into a trust for the Appellant Rosemary, to be paid in monthly payments for her maintenance and support. Defense counsel then attempted several times to question the witness as to why the victim had his will prepared with a trust provision. Each time the State's hearsay objection was sustained by the trial court. In an offer to prove defense counsel maintained if allowed to answer, the witness would say that he prepared the wills with a trust provision because the victim felt that if his wife inherited a large sum of money, Mariann Vandiver would get all or most of the money away from her mother, leaving little or nothing for Rosemary and Paul Jr. Appellant Rosemary now argues that such testimony was not hearsay in that it merely illustrated the victim's state of mind and that it was probative of the victim's reasons for doing what he did. Hearsay is testimony in court or written evidence of a statement made out of court, such statement being offered as an assertion to show the truth of matters asserted therein and thus resting for its value upon the credibility of the out of court asserter. *Torres v. State* (1982), Ind., 442 N.E.2d 1021, 1024. In the present case the attorney witness could only explain why the testator changed his will be relying on the veracity of the victim-testator, Paul Komyatti, Sr. It was therefore inadmissible as hearsay evidence unless it falls within an exception recited by Appellant. Contrary to Appellant's contentions, the testimony of the witness here was not probative of the witness' reasons for doing what he did nor was it admissible because it illustrated the victim's state of mind. The witness, as the trial judge properly noted, changed the will because his client directed him to do so. Any knowledge he might have regarding why his client asked him to do so depended on the veracity of the out-of-court asserter and was therefore inadmissible hearsay. Nor was the testimony admissible as evidence of the victim's state of mind. The victim's state of mind was irrelevant to the issues in this case and its admission there-

fore cannot be justified to prove the truth of the matter asserted when the matter asserted is not relevant to the issues of the case. The State's hearsay objections were properly sustained.

### VII

Rosemary Komyatti further alleges the trial court erred in allowing certain photographs to be admitted into evidence. She sought to sever her trial from Paul's but her motion was denied. The State offered as evidence photographs of the dismembered body of Paul Sr. Rosemary objected, alleging the photographs were irrelevant and immaterial regarding her case. The trial court overruled the objection and admitted the photographs. Appellant's theory is that the dismemberment was not her idea, she provided none of the tools, she was not in the room at the time, nor did she dispose of any of the body parts. She further argues the photographs were irrelevant and immaterial because the cause of death was the stabbing, not the dismemberment.

Appellant concedes photographs of a corpse may be admissible, even if they portray a gruesome spectacle and may arouse passion and resentment against the defendant in the minds of the jury, as long as they are material and relevent. *Schmidt v. State* (1970), 255 Ind. 443, 455, 265 N.E.2d 219, 225. She also concedes where there is evidence of cooperation by a co-conspirator in a plan to murder a victim and dismember his body in order to facilitate its removal and disposal, photographs of the dismembered body are properly admissible. *Id.*

Rosemary was charged with both conspiracy to commit murder and murder. There is much evidence that she cooperated in the conspiracy, including purchasing poison, passing poison to her co-conspirators, administering poison, and cleaning the room after the dismemberment. In light of this evidence of the conspiracy, the acts of all co-conspirators are admissible against and attributable to each other conspirator, even if the acts were done in the defendant's absence. *Beeson v. United States*

(7th Cir.1937), 90 F.2d 720, 722; *Patton v. State* (1961) 241 Ind. 645, 648, 175 N.E.2d 11, 12; *Montgomery v. State* (1982), Ind. App. 439 N.E.2d 646, 647, *reh. denied* (1982). Hence, we are concerned not only with Rosemary's actions, but with all acts in furtherance of the conspiracy, including the dismemberment of Paul Sr. Furthermore, it is not clear that the stabbing was indeed the cause of death. Pathologist Yound M. Kim testified there was no way he could distinguish whether the cause of death was the stabbing or the dismemberment.

### VIII

Finally, Rosemary Komyatti maintains her sentence was manifestly unreasonable. The trial court sentenced her to fifty-five (55) years for murder and forty-five (45) years for conspiracy to commit murder, to run consecutively. The trial court considered her lack of criminal past as a mitigating factor, but found the following aggravating factors: she is in need of correctional and rehabilitative treatment best provided by commitment to a penal facility; there were no strong feelings to motivate the intentional killing; the motive was monetary; and she used her children as her tools. To justify imposing consecutive sentences the court pointed out the plot, the family involvement, the method used, the dismemberment, and the lack of remorse.

Appellant alleges the court's reasons for the sentence are incorrect and make the sentence manifestly unreasonable. To support her allegation Appellant again argues there was insufficient evidence to support the trial court's rationale.

The proper sentencing procedures in effect at the time of Appellant's trial were Ind.Code §§ 35–50–1–2, 35–50–2–3, and 35–50–2–4 (Burns 1979) and were properly followed. A reviewing court will not revise a sentence authorized by statute unless such sentence is manifestly unreasonable in light of the nature of the offense and character of the offender. A sentence is not manifestly unreasonable unless no reasonable person could find such sentence

appropriate to the particular offense and offender for whom such sentence was imposed. *Freed v. State* (1985), Ind., 480 N.E.2d 929, 931; Ind.R.App.Rev.Sen. 2. Appellant has not met this burden. There is sufficient evidence that Appellant took an active part in a conspiracy to murder her husband, wherein the motive was monetary gain. After the murder the body was dismembered and buried, and the co-conspirators continued to cover up their actions. We do not find the sentences manifestly unreasonable nor inappropriate in view of the facts and circumstances presented here.

The trial court is in all things affirmed.

GIVAN, C.J., and DeBRULER, SHEPARD and DICKSON, JJ., concur.