Jim LOWERY, Appellant
(Defendant Below),

v.

STATE of Indiana, Appellee
(Plaintiff Below).

No. 483S116.

Supreme Court of Indiana.

June 4, 1985.

Rehearing Denied July 22, 1985.

Susan K. Carpenter, Public Defender, David P. Freund, Deputy Public Defender, Indianapolis, for appellant (defendant below).

Linley E. Pearson, Atty. Gen., Michael Gene Worden, Deputy Atty. Gen., Indianapolis, for appellee (plaintiff below).

PIVARNIK, Justice.

Defendant was found guilty by a jury in the Hendricks Circuit Court in a bifurcated trial of two counts of murder and one count of attempted murder. The jury recommended the death penalty for each murder conviction. The trial court sentenced Defendant to death for the two murder con-victions and to a term of fifty (50) years for the attempted murder conviction.

Fifteen issues have been presented for our determination in this direct appeal as follows:

1. whether the Indiana death penalty statute constitutes vindictive justice;

2. lack of specific rules governing the review of death sentences;

3. denial of Defendant's request for funds to hire an expert to assist counsel during jury selection;

4. refusal of the trial court to permit individual *voir dire* of each prospective juror;

5. denial of Defendant's Motion to Suppress;

6. error in admission of trial testimony of witness James Bennett;

7. error in admission of certain State exhibits;

8. error in admitting testimony of witness George Ross;

9. error in admission of Defendant's Exhibit E on motion of the prosecution;

10. admission of opinion testimony of Dr. Miller;

11. permission of Detective Payne to testify about a pretrial identification display;

12. allowing leading questions by the prosecution;

13. error in the giving of an accomplice instruction;

14. sufficiency of the evidence; and

15. error in finding that the aggravating factors outweighed the mitigating factors.

On September 30, 1979, Mark and Gertrude Thompson were in their country home in West Point, Tippecanoe County, Indiana. Both Thompsons were past 80 years of age, in declining health, and needed assistance in caring for themselves and their property. On that date, both were killed by gunshot in their home. Before this date, the Thompsons had employed Defendant-Appellant James Lowery and his wife as caretakers. The Thompsons, dissatisfied with the Lowerys, asked them to

leave and ordered them out of the provided trailer and off the property immediately. The Lowerys refused to leave that quickly and after some discussion, Mark Thompson gave the Lowerys a check for one-hundred ($100.00) dollars in exchange for leaving immediately. Weeks before September 30, Lowery and Jim Bennett discussed committing a crime for pecuniary gain. Lowery told Bennett he knew where he could get some money, but he did not disclose the place at that time. About three weeks prior to September 30, Bennett gave Lowery a .32 caliber nickel or chrome plated pistol and some ammunition. The gun was supposedly for Barbara Lowery's protection while Lowery was not home. On September 30, Bennett picked Lowery up and followed Lowery's directions. Bennett knew, in general, that they were driving to West Point to rob Lowery's former employers. Later, Lowery told Bennett more specifically that they were going to the Thompson's residence to force Mr. Thompson to write a check for nine-thousand ($9,000.00) dollars, then kill and bury both Thompsons. He also planned to take Thompson's gun collection. As they approached the Thompson residence around dark, Lowery carried the pistol and Bennett a sawed-off shotgun.

Janet Brown, housekeeper and caretaker for the Thompsons, was sitting in the trailer where she lived, adjacent to the Thompson's garage, reading a book when she heard the Thompson's dog bark, and a man with a gun in his hand kicked the door open and entered. Brown recalled having once met the man at the West Point Post Office. She and Lowery had struck up a conversation about their motorcycles. When she told Lowery she worked for the Thompsons, he had remarked that he too had worked for them at one time. He said Mark Thompson was all right but to watch out for Mrs. Thompson as she was hateful. He recounted how they were ordered to leave the Thompsons' and how he had first requested payment of one hundred ($100.00) dollars. Brown thought Lowery spoke hatefully of the Thompsons. She identified Jim Lowery as the man who came into the trailer with a gun the evening of September 30, 1979.

After Lowery broke into Brown's trailer, he held the gun against Brown's neck and forced her to take him to the Thompson's residence. Brown saw someone with Lowery but said she did not get a good look at him. Bennett testified similarly to Brown about these events. Lowery took Brown into the kitchen where Mark Thompson was standing. He told Thompson he was being held up and then shot him in the stomach. After shooting Mark Thompson, Lowery forced Brown, with a gun to her head, through the kitchen and down the hall to the den where Gertrude Thompson was watching television. Lowery ordered Mrs. Thompson to get up and move and as she was walking down the hall, he struck her in the head with the gun. Blood spurted from her head and she began to stagger. After Lowery forced Brown and Mrs. Thompson into the kitchen, he shot Mrs. Thompson in the head and also shot Brown. Brown had her hand over her head when Lowery fired at her, causing injury to her hand and her head, but not fatally wounding her. As she lay bleeding, not sure how seriously she was injured, the burglar alarm began ringing. Mark Thompson apparently had activated it. She testified that at that time Lowery and the person with him became excited and Lowery went back to where Mark Thompson was and she heard two more shots. Lowery still wanted to find something to take from the house, but because the siren was ringing and they feared the police would come soon, Lowery and Bennett fled by way of the back roads. They returned to Lowery's place where they told Barbara Lowery about the shootings. After Lowery was apprehended by the police, he made several voluntary incriminating statements to numerous police officers. Later, in the jail cell, he admitted the perpetration of these crimes to his cellmate and detailed the manner in which they were executed.

I

■ Appellant claims the Indiana Death Penalty Statute violates the Indiana Consti-

tution, Art. 1, § 18, which provides, "The penal code shall be founded on the principles of reformation and not of vindictive justice." We have reviewed this issue on many occasions and have found that the death penalty, as part of our criminal code, does not violate the Constitution. In *Dillon v. State*, (1983) Ind., 454 N.E.2d 845, 852, *cert. denied*, (1984) — U.S. —, 104 S.Ct. 1617, 80 L.Ed.2d 145 we pointed out:

> "[A]rticle 1, Section 18 of the Indiana Constitution is an admonition to the legislative branch of the state government and is addressed to the public policy which the legislature must follow in formulating the penal code. It applies to the penal laws as a system to insure that these laws are framed upon the theory of reformation as well as the protection of society. *Schiro v. State*, (1983) Ind., 451 N.E.2d 1047; *Williams v. State*, (1982) Ind., 430 N.E.2d 759, *appeal dismissed*, (1982) 459 U.S. 808, 103 S.Ct. 33, 74 L.Ed.2d 47; *Brewer v. State*, (1981) [275] Ind. [338], 417 N.E.2d 889, *cert. denied*, (1982) 458 U.S. 1122, 102 S.Ct. 3510, 73 L.Ed.2d 1384; *Judy v. State*, (1981) [275] Ind. [145], 416 N.E.2d 95; *French v. State*, (1977) 266 Ind. 276, 362 N.E.2d 834."

Defendant does not present any reason for changing our rationale and holdings in these cases. Thus, we affirm our position in the above cited cases and hold the Indiana death penalty does not violate the vindictive justice provision of the Indiana Constitution.

## II

■ Appellant next claims the Indiana Supreme Court has failed to establish necessary rules providing for meaningful appellate review of the death sentence. This Court has already decided this issue by holding in several cases that existing Supreme Court rules appropriately provide for the meaningful appellate review of every death sentence. *Burris v. State*, (1984) Ind., 465 N.E.2d 171, *cert. denied*, — U.S. —, 105 S.Ct. 816, 83 L.Ed.2d 809; *Daniels v. State*, (1983) Ind., 453 N.E.2d 160, *reh. denied; Williams v. State*, (1982) Ind.,

430 N.E.2d 759, *appeal dismissed*, 459 U.S. 808, 103 S.Ct. 33, 74 L.Ed.2d 47, *reh. denied*, 459 U.S. 1059, 103 S.Ct. 479, 74 L.Ed.2d 626; *Brewer v. State*, (1981) 275 Ind. 338, 417 N.E.2d 889, *cert. denied*, 458 U.S. 1122, 102 S.Ct. 3510, 73 L.Ed.2d 1384, *reh. denied*, 458 U.S. 1132, 103 S.Ct. 18, 73 L.Ed.2d 1403.

For reasons expressed in these opinions, Defendant's argument fails on this issue.

## III

Prior to trial Defendant filed a motion for permission to use the assistance of a juristic psychologist during the jury *voir dire* process at public expense. Appellant claims the trial court abused its discretion by denying this motion.

■ In Indiana, appointment of experts to assist the defense is a matter reversed only on a showing of abuse of discretion. *Griffin v. State*, (1981) 275 Ind. 107, 415 N.E.2d 60; *Owen v. State*, (1979) 272 Ind. 122, 396 N.E.2d 376. The same standard is applicable to capital cases wherein the accused requests expert assistance for the *voir dire* portion of the trial. *Thomas v. State*, (1984) Ind., 459 N.E.2d 373. Defendant does not give any specific reason why an expert was necessary for the *voir dire* questioning. On a similar question, the Seventh Circuit, U.S. District Court found that while some experts had been used in the jury selection process, this is hardly necessary for an adequate defense. *U.S. v. Harris*, (7th Cir.1976) 542 F.2d 1283. Defendant has failed to establish an abuse of discretion and we find no error on this issue.

## IV

Prior to trial Defendant filed a written motion requesting individual *voir dire* examination of each prospective juror. After a hearing on the motion, the trial court determined *voir dire* would be done in the usual manner which does not provide the separation of prospective jurors. Appellant claims this was error.

It is well settled the trial judge has broad discretion in controlling the *voir dire* of prospective jurors. *Partlow v. State,* (1983) Ind., 453 N.E.2d 259, *cert. denied* (1984) — U.S. —, 104 S.Ct. 983, 79 L.Ed.2d 219; *Fielden v. State,* (1982) Ind., 437 N.E.2d 986. In *Fielden,* we resolved this issue adverse to Appellant's position. We agree with the State's contentions that the trial court has other ways of protecting the impartiality of jurors, such as holding extensive individual questioning when a juror's answers indicate potential problems. Also, if the *voir dire* is not done individually, the jurors can be extensively questioned regarding the influence other jurors' answers may have on them. Appellant fails to demonstrate any prejudice resulting from the collective jury *voir dire.* Therefore, he fails to establish he was denied a fair trial by the trial court's decision. Accordingly, we find no abuse of discretion in the trial court's denial of the motion.

## V

Prior to trial Defendant motioned to suppress statements made to several police officers after his arrest. The trial court granted the motion in part and denied it in part. Defendant complains that the partial denial of the motion to suppress was error. Accordingly, the testimony of Officers Bridge, Chase, and Ross regarding incriminating statements should have been excluded.

When reviewing the voluntariness of a confession or statement this Court does not weigh the evidence or judge the credibility of witnesses, but rather determines if there was substantial probative evidence to support the trial court's findings. *Partlow v. State, supra; Chandler v. State,* (1981) 275 Ind. 624, 419 N.E.2d 142. The State contends the testimony of all three officers was admissible because they referred to wholly volunteered and unsolicited statements by the accused which were not the product of custodial interrogation such that any advisements of rights needed to be given. *Miranda v. Arizona,* (1966) 384 U.S. 436, 86 S.Ct. 1602,

16 L.Ed.2d 694; *Tacy v. State,* (1983) Ind., 452 N.E.2d 977, *reh. denied; Johnson v. State,* (1978) 269 Ind. 370, 380 N.E.2d 1236. In *Johnson,* this Court discussed interrogation as follows:

"The term 'interrogation' has been defined as a process of questioning by law enforcement officials which lends itself to obtaining incriminating statements. *Escobedo v. Illinois* (1964), 378 U.S. 478, 485, 84 S.Ct. 1758, 1762, 12 L.Ed.2d 977, 986. Not every statement uttered by a police officer which is punctuated with a question mark will necessarily constitute an interrogation. *See e.g. Bugg v. State* [267 Ind. 614, 372 N.E.2d 1156 (1978)], *supra.* Rather, it is necessary to view the statement in the context in which it was made. If, after having done so, it does not appear that the purpose of the remark was to obtain a confession from the accused, *Miranda* is not triggered and it is not necessary that the accused first be advised of his rights."

*Id.* at 1240.

Further, in *Resnover v. State,* (1984) Ind., 460 N.E.2d 922, 932, *reh. denied,* this Court observed:

"The United States Supreme Court has held that the 'interrogation' conceptualized in its *Miranda* opinion must reflect a measure of compulsion above and beyond that inherent in custody itself. Any statement made freely, voluntarily and without any compelling influence is admissible into evidence. *Rhode Island v. Innis,* (1980) 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297; *Roberts v. United States,* (1980) 445 U.S. 552, 100 S.Ct. 1358, 63 L.Ed.2d 622. *Innis* further held that *Miranda* applies only to words or actions by police officers which the officers should have known were reasonably likely to elicit an incriminating response."

Officer Bridge, of the Crawfordsville Police Department, while alone with Defendant awaiting transportation for Defendant to Tippecanoe County, did not ask Defendant any question. However, Defendant voluntarily admitted to the crime and told Bridge

he did it because he hated Mr. Thompson who had "ripped off" people with his law practice. He also commented that if he had not been caught he would have gone after Jack Burns, whom he heard had propositioned his wife while Defendant was in jail. He further told Bridge that Bridge would be a hero for capturing him and that he, Defendant, would be famous like Roger Drollinger. He explained he was upset with Mr. Thompson because Thompson had kicked his family and him out. He mentioned that when he heard on the radio that the housekeeper had survived, he knew he was in trouble. The evidence showed that Officer Bridge did not question Defendant at any time while waiting for transportation, nor did he discuss the case with Defendant.

Lt. Jack Chase of the Tippecanoe County Sheriff's Department testified that on October 2, 1979, he accompanied Lt. Worthington to transport Defendant to Tippecanoe County. Lt. Chase was in the back seat with Defendant. Chase did not question Defendant but did converse with him. Defendant told him, without any prompting or questioning, that Defendant's partner had brought the guns to the Thompson residence and that Defendant had fired only one shot. He did not say who his partner was, but remarked he was not concerned if someone else got shot, even if it was a policeman. Defendant further stated he probably would get the electric chair, but was hoping to get natural life instead. After arriving at the Tippecanoe County Jail Chase booked Defendant, which required him to ask only general information such as name, birthdate, etc. Chase never questioned Defendant about the crime.

On October 9, 1979, Sheriff Hager asked Sergeant George Ross, who was at Tippecanoe County Jail on business not concerning Defendant's case, to accompany him to Defendant's cell. The Sheriff informed Defendant he could shower, but when the officers were preparing to leave Defendant asked Ross to remain. Ross told Defendant he could not discuss the case with him, but Defendant persisted and told Ross that he had heard on the street that he, Defend-

ant, was as big or bigger than Charles Manson in the area. He said he had shot Mark Thompson but not the woman. He also told Ross he had been in a mental institution at age sixteen (16) and thought his lawyers were getting the records to prove him insane.

■ Not one of the officers interrogated Defendant in a custodial atmosphere. Further, Defendant clearly volunteered all of the statements made to them. Thus, the officers were not required to give any warnings, even assuming they had opportunity to do so. Nor does the failure of giving *Miranda* warnings prior to any of the statements render them inadmissible into evidence. *Resnover, supra; Partlow, supra; Tacy, supra.* Appellant claims his statement to Lt. Chase regarding his preference to a life sentence rather than death was an attempt at a plea negotiation, rendering the statement inadmissible. However, the facts do not support his contention. The Court of Appeals stated in *Moulder v. State,* (1972) 154 Ind.App. 248, 289 N.E.2d 522, 527, "The character of the communication is the test to be applied. The communication must have as its ultimate purpose the reduction of punishment or other favorable treatment from the State to the defendant." It is clear Defendant's statement to Chase was not an attempt to negotiate for a lesser penalty, but was merely an expression of his feelings regarding the death penalty.

■ Defendant further claims that his attorney was not notified of the meeting between Defendant and Ross; therefore, his statements to Ross were inadmissible. We see no merit to this contention. Defendant's statements, made voluntarily, do not become inadmissible simply because Defendant's counsel was not notified or present. *Sater v. State,* (1982) Ind., 441 N.E.2d 1364; *Kern v. State,* (1981) Ind., 426 N.E.2d 385; *Porter v. State,* (1979) 271 Ind. 180, 391 N.E.2d 801, *reh. denied.* Accordingly, Appellant has not demonstrated any error on this issue.

## VI

This is the second trial of Defendant Lowery on these charges. He was tried and convicted of these same charges and sentenced to death in a previous trial. That judgment was reversed by this Court on an issue unrelated to any presented in this appeal. *Lowery v. State*, (1982) 434 N.E.2d 868, *reh. denied.*

James Bennett, Defendant's accomplice, testified for the State in the first trial pursuant to a plea agreement. However, in this trial he refused, outside the presence of the jury, to testify unless he received a better deal from the State. The trial court ordered him to testify and held him in contempt when he refused. Later in the trial, the State again asked Bennett to testify but he still refused. The State then offered Bennett's testimony from a transcript of the previous trial. Since Bennett refused to testify, despite being held in contempt, the trial judge, over Defendant's objection, permitted the State to read the transcript of Bennett's testimony at the first trial to the jury. Appellant argues this evidence was erroneously admitted for it denied him the right of cross-examination. Further, he claims the State failed to establish that Bennett was unavailable, so it was error not to allow him to show that Bennett had recanted his trial testimony.

 Defendant concedes the admission of former testimony of an unavailable witness is a matter committed to the discretion of the trial court. *Pollard v. State*, (1979) 270 Ind. 599, 388 N.E.2d 496. This Court has long recognized prior recorded testimony is an exception to the hearsay rule. Evidence consisting of a now unavailable witness' recorded testimony, given at a prior judicial proceeding where there was sufficient identity of issues with those of the present proceeding and where the adverse party had a chance to cross-examine the now unavailable witness, is admissible as evidence in the subsequent proceeding. *Raines v. State*, (1971) 256 Ind. 404, 269 N.E.2d 378, *reh. denied; Stearsman v. State*, (1957) 237 Ind. 149, 143 N.E.2d 81; *Levi v. State*, (1914) 182 Ind. 188, 104 N.E.

765. The unavailability of the witness may be due to "death or insanity of the former witness, the absolute impossibility of securing his presence, his absence by procurement of the defendant, or such non-residence as will preclude the taking of his deposition...." *Id.* Also, it is well established that the admission of prior testimony of an unavailable witness does not violate the confrontation clause. *Ohio v. Roberts*, (1980) 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597; *California v. Green*, (1970) 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489. The transcript read to the jury was of a prior proceeding involving the same issues and parties and in which Bennett was subjected to full cross-examination. In *California v. Green*, the United States Supreme Court held a witness' refusal to testify renders him unavailable for purposes of the use of his prior testimony. Thus, Bennett's unreasonable refusal to testify rendered him unavailable and the trial court did not err by admitting Bennett's former testimony. Defendant further argues that because Bennett did not testify at this trial, Defendant was denied the ability to cross-examine Bennett about a letter written subsequent to the first trial in which Bennett attempted to recant his prior testimony. Defendant cites no authority to support this claim; therefore, the State's contention that he has waived any claim of error on this issue is well taken. *Sandlin v. State*, (1984) Ind., 461 N.E.2d 1116, 1118. However, as the State points out, the record further shows there is nothing to support Defendant's claim that because Bennett's prior testimony was admitted Defendant was prevented from informing the jury about Bennett's attempt to recant his trial testimony. The trial court indicated Defendant could inform the jury about statements the witness made since the taking of the transcript if they concerned the witness' credibility. However, Defendant did not attempt to present the letter after Bennett's prior testimony was admitted. Consequently, the court did not have an opportunity to rule on an offer of the letter, and there is no error presented for our

review. *Wells v. State*, (1982) Ind., 441 N.E.2d 458, *reh. denied.*

Defendant further claims the trial court erred by refusing to redact portions of the former testimony of James Bennett because objections at the first trial to these portions should have been sustained. He contends the court should have considered the objections in this reading, sustained them, and excluded that testimony. Defendant refers to nine objections in the first trial. Objections one to seven relate to a conversation between Bennett and Barbara Lowery the night of the crime. Objection eight concerns a subsequent conversation with Barbara Lowery later that same night, and objection nine relates to what Bennett told the police after his arrest. With respect to objection nine, Defendant concedes that this is not hearsay and cannot be argued as such in this appeal. Defendant therefore waives the argument in consideration of this issue.

 The other eight objections refer to prior out-of-court statements made by Barbara Lowery to James Bennett the night of the murders. The State contends that while Bennett's testimony may have concerned a hearsay statement, the testimony was not inadmissible hearsay since a prior out-of-court statement is permissible as substantive evidence if the declarant is available for cross-examination. *Watkins v. State*, (1983) Ind., 446 N.E.2d 949. Barbara Lowery testified she conversed with Bennett the night of the murders, which subjected her to cross-examination concerning the circumstances surrounding her conversation with Bennett. However, Defendant did not cross-examine her about any conversation. Contrary to Defendant's claim, Barbara Lowery was available for cross-examination regarding her statements. She did not deny making statements to him, nor was she unable to recall the statements; she simply was not questioned about them. Further, Defendant did not make any attempt to recall her to the stand to question her about conversations referred to in Bennett's prior testimony. Defendant concedes with regard to objec-

tion eight, Barbara Lowery did testify about a subsequent conversation between Bennett and Barbara Lowery, which subjected her to cross-examination about this testimony. Defendant still claims this portion of Bennett's prior testimony was inadmissible because it was a mere substitute for Bennett taking the stand and testifying at the second trial. He cites *Lewis v. State*, (1982) Ind., 440 N.E.2d 1125, *cert. denied*, (1983) 461 U.S. 915, 103 S.Ct. 1895, 77 L.Ed.2d 284, for this contention. Although *Lewis* denounced the use of substantive evidence of the out-of-court statement in lieu of the declarant's in-court testimony, our holding in *Lewis* does not prohibit the use of an out-of-court statement when the declarant has been made available for cross-examination, as appears here. Barbara Lowery testified at trial that she conversed with Bennett at his residence the night of the murders. Consequently, Bennett's former testimony concerning what she told him in that conversation was not in lieu of available testimony of the witness-declarant at trial. Defendant's objections to admission of these portions of Bennett's prior testimony were, therefore, properly overruled. *Watkins, supra; Williams v. State*, (1983) Ind., 455 N.E.2d 299–305; *Lewis, supra.*

### VII

Defendant claims the trial court erred in admitting numerous State exhibits into evidence.

 He first objects to the admission of State's Exhibits 76, 77, 95, and 166. Exhibit 166 was a transcript of the tape recording constituting Exhibit 95. Exhibit 95, the tape recorded statement of Defendant's former wife, Barbara Lowery, was given to the police a few days after the murders. However, Exhibit 166 was never presented to the jury, so any issue regarding its admission is moot. *Lowery v. State*, (1982) Ind., 434 N.E.2d 868, *reh. denied.* Defendant claims Exhibit 95 is inadmissible hearsay. The record shows that before Exhibit 95 was admitted into evidence and played to the jury, Barbara Lowery testified in

open court regarding the statement she gave the police. Although she could not recall the details of her statements to the police, she acknowledged giving them. This issue was raised on Defendant's first appeal and we held that since the declarant was at trial and subject to cross-examination of the statement she gave the police, the tape recorded statement was admissible. We reaffirm that position here. *Lowery v. State, supra.* Exhibits 76 and 77 present a similar question. Exhibit 76 is a tape recording of two statements given by Janet Brown to the police while she was in the hospital on the night of the murders. Exhibit 77 is a transcript of the same statements. Defendant claims these exhibits were also inadmissible hearsay. However, before these exhibits were admitted at trial, Janet Brown testified in open court. She recalled making statements to the police at the hospital on the night of the murders and stated she recalled most of what she told the police. These exhibits were also admissible for the same reasons we held Exhibit 95 to be admissible. *Lowery, supra.*

Defendant objected to the admission of State Exhibits 10, 11, 13, 14, 15, 16, 18, 19, 20, 23, 26, 31, 32, 35, 36, 38, 39, 46, 47, 53, 54, and 68, photographic slides depicting the victims' residence, claiming they were cumulative and repetitive. He objected to Exhibits 106, 108, 112, 113, 116, 117, 123, 136, and 141, photographic slides of the crime scene and of the victims, including autopsy photographs, claiming these slides were unduly inflammatory and repetitious. Defendant claims Exhibit 6, a photograph of Mr. Thompson during his life, is unduly repetitious since Exhibit 5 was a photograph of Mr. and Mrs. Thompson during their lives. Exhibit 75, a photograph of the wound to Janet Brown's hand, Defendant objected to as being cumulative and superfluous. State's Exhibit 102 depicts the scene of the crime, particularly the location of Mrs. Thompson's glasses, with her hand and part of her arm showing. Defendant claims this photo was unduly repetitious of others.

It is well-settled that the admission of photographs is within the sound discretion of the trial court and will not be disturbed except for an abuse of discretion. *Jones v. State,* (1983) Ind., 456 N.E.2d 1025; *Paige v. State,* (1982) Ind., 441 N.E.2d 438. The admissibility of a photograph is dependent upon its relevancy. *Ferry v. State,* (1983) Ind., 453 N.E.2d 207. Admittedly, many of these photographs are gruesome. They are photographs of the scene of the murders, including the bodies of the victims. Several of the photographs were taken at different angles and show Mrs. Thompson lying in a pool of blood with her brains exposed and her entire head and face covered with blood. However, the fact that a photograph is gruesome does not render it inadmissible. *Ferry, supra; Grimes v. State,* (1983) Ind., 450 N.E.2d 512, 516. Defendant must show that the photographs' tendency to improperly influence the jury outweighed their probative value to the extent that they were unduly prejudicial. *Strange v. State,* (1983) Ind., 452 N.E.2d 927, *reh. denied.* Photographs of a crime scene are generally admissible because they are competent and relevant aids by which a jury can orient itself to best understand the evidence presented to it. *Grimes, supra; Stewart v. State,* (1982) Ind., 442 N.E.2d 1026. Even though photos are repetitious and cumulative of the crime scene, they are admissible as long as they are competent and relevant aids to the jury in orienting them and helping them to understand the evidence. *Ferry, supra; Lloyd v. State,* (1983) Ind., 448 N.E.2d 1062, 1070, *reh. denied.* Further, the admission of cumulative evidence is within the sound discretion of the trial court. *Dresser v. State,* (1983) Ind., 454 N.E.2d 406. Although several photographs depicted the same area, the slides indicated the photos were taken from different angles and distances and calculated to aid the jury in visualizing the crime scene, thereby helping them to understand the testimony of other witnesses. The Police testified that all of the photographic slides were true and accurate depictions of the Thompson residence and the autopsy.

Defendant has failed to establish that the probative value of the slides was outweighed by their tendency to improperly prejudice the jury.

■ Defendant claims it was error to admit Exhibit 85, a copy of James Bennett's plea agreement, because it contained reference to polygraph examinations. The record shows that in Defendant's first appeal, *Lowery v. State, supra,* this Court determined the jury never saw the plea agreement or knew a polygraph examination was administered; thus, this Court found the issue to be moot. We are revisited with the same situation on this appeal. The plea agreement was received into evidence but was never submitted to the jury. Thus, the issue is moot in this appeal also.

## VIII

■ Defendant claims the trial court erred by permitting Sergeant Ross to testify about a statement made by Defendant's wife the night of the murders, claiming this testimony was hearsay. Defendant objected when the State asked Ross to state what Mrs. Lowery told him the night of the murders about her husband's whereabouts. Although Barbara Lowery had testified previously at trial and had been cross-examined by Defendant, she was available and subject to further cross-examination by Defendant *Rapier v. State,* (1982) Ind., 435 N.E.2d 31; *Patterson v. State,* (1975) 263 Ind. 55, 324 N.E.2d 482. Defendant claims the *"Patterson* rule" does not permit the admission of this testimony because Barbara Lowery testified she could not recall what she told the police about the circumstances under which Defendant left the day of the murders. He claims it was, therefore, impossible to cross-examine her on that issue, citing *Watkins v. State,* (1983) Ind., 446 N.E.2d 949. However, Barbara Lowery was able to recall her discussion with the police on that night and affirm that she had made statements to them. Even though she was unable to recall her statements in detail, the record shows Defendant never attempted to cross-examine her about the statements Ross attributed

to her, nor did he attempt to recall her for further cross-examination. Additional testimony indicated Barbara Lowery's statements to the police were not true and were made to protect the defendant. This clearly affected her credibility. However, because her testimony was generally adverse to Defendant, Sergeant Ross' testimony aided the defense, by substantiating the fact she uttered the untruths, as opposed to causing the defense harm. Further, in view of the overwhelming direct evidence indicating Defendant was guilty, including his own statements made to several witnesses, Defendant was not harmed by this alleged hearsay to the extent that it merits reversal. *Brewster v. State,* (1983) Ind., 450 N.E.2d 507.

## IX

■ During Defendant's cross-examination of Barbara Lowery, defense counsel questioned her about Exhibit E, a letter written by James Bennett to Barbara Lowery. The State's objection, on the basis of hearsay, was overruled by the trial court. Defendant attempted to introduce the letter into evidence but the State objected and Defendant withdrew the offer. Defendant then used the letter to refresh the witness' recollection. On redirect examination, the State asked Barbara Lowery if she had used Exhibit E to refresh her recollection. When she testified she had, the State offered it into evidence. Defendant objected to the State's offer, claiming that it was the Defendant's exhibit and that the defense intended to offer it through another witness. The court requested a basis for the objection and defense counsel stated the exhibit lacked a foundation. Prosecution claimed a foundation was laid by showing the witness refreshed her memory from the exhibit, and as such the entire exhibit was admissible into evidence. The trial court stated, "That is the doctrine of curity admissibility, objection overruled, foundation established, Defendant's Exhibit E admitted over that objection, foundation." The letter was then read to the jury.

We fail to see any reversible error regarding this issue. The defendant indicated a desire to admit this exhibit into evidence, attempting to do so through this witness and a subsequent witness. Therefore, no harm can be shown to the defendant, and no error is presented. *Brewster, supra.*

### X

Defendant claims the trial court erred by permitting expert witness, Dr. Miller, to give an opinion about the distance between Mrs. Thompson's head and the gun that shot the fatal blow. Defendant claims Dr. Miller was not sufficiently qualified to render this opinion. Dr. Miller testified to his formal education in medicine, including training in pathology. At the time of trial, Dr. Miller was an Associate Professor of Pathology at Purdue University. He had practiced in the field of Pathology from 1949 to 1980. During his practice he had performed an estimated 2,000 autopsies, some of which were on the bodies of gunshot victims. He participated in the autopsy on Mrs. Thompson. Miller was questioned about the gunshot wound to Mrs. Thompson's head, particularly the fact that a dark grey or black discoloration formed a ring around the wound. He testified he did not perform a microscopic examination of the discoloration and he further admitted that he was not a ballistics expert. He was questioned as to whether, based upon his prior experience as a pathologist and having examined other gunshot wounds, he had an opinion on the distance from which Mrs. Thompson was shot. Over Defendant's objection, Miller responded it was his opinion the gun was fired from approximately one foot from Mrs. Thompson's head.

It is well settled that the determination of whether a witness is qualified to testify as an expert lies in the sound discretion of the trial court. *Grimes v. State, supra; Forrester v. State,* (1982) Ind., 440 N.E.2d 475 at 480. Determination of the distance from which a gun was fired to the homicide victim's wound is a subject matter beyond the knowledge of the average person. In *Moody v. State,* (1983) Ind., 448 N.E.2d 660, this Court reiterated the rule that an expert witness is one who, by reason of education or special experience, has knowledge respecting a subject about which persons having no particular training are incapable of forming an accurate opinion or making a correct deduction. Practical experience may qualify one as an expert as readily as formal training. *Warner v. State,* (1983) Ind., 455 N.E.2d 355. Dr. Miller's lengthy experience in the field of pathology, including prior examinations of gunshot victims, permitted the trial court to determine he had sufficient knowledge in the field so that his opinion probably would aid the trier of fact in its search for truth. Defendant's complaints about Dr. Miller's testimony go to the weight of this testimony rather than its admissibility. Defendant has failed to demonstrate the trial court abused its discretion by permitting Dr. Miller to give his opinion as to the distance of the gun from Mrs. Thompson's head when she was killed.

### XI

Janet Brown, the surviving victim of Defendant's crimes, testified at trial without objection to a photographic identification of Defendant made while she was in the hospital recovering from her injuries. Later at trial, Detective Payne was questioned about Janet Brown's identification of Defendant from the photographic display. Defendant objected to this testimony claiming it was immaterial and hearsay. The State responded that the testimony was relevant and material to the issue of identification of the perpetrator, thus corroborating the earlier testimony of Janet Brown. Further, the State contended the admission of these photographs was relevant to showing how Janet Brown was able to identify Defendant in 1979, for by the time of this trial Defendant's appearance had changed significantly. The State concedes that even though this testimony was relevant and material, the testimony complained of does fall within the definition of

hearsay pursuant to *Moody v. State, supra.* However, Janet Brown had already provided this same evidence and her testimony was permitted without objection from Defendant. It is well settled that any error in admission of evidence is harmless if the same or similar evidence has been admitted without objection. *Crafton v. State,* (1983) Ind.App., 450 N.E.2d 1042. Since the testimony of Payne was cumulative of other evidence admitted without objection, the fact that it may have been hearsay does not present reversible error, particularly in view of the overwhelming evidence indicating Defendant was guilty. *Moody, supra; Lottie v. State,* (1980) 273 Ind. 529, 406 N.E.2d 632, 640, *reh. denied.* We therefore find no reversible error on this issue.

### XII

■ Defendant complains the prosecutor often asked leading questions of its witnesses which prejudiced the defendant. The State complains Defendant waived this issue. The specification of error from Defendant's Motion to Correct Errors states:

"No. 7. The trial court erred in allowing, over repeated objection, the prosecutor to lead State's witnesses through their testimony."

In the memorandum accompanying the motion to correct errors Defendant elaborates on the specification of error by stating:

"No. 7. Throughout the trial, although objections were sometimes sustained, the prosecutor was allowed to lead the State's witnesses through their testimony. Such practice amounts to testimony by the prosecutor with the witness function to either admit or deny the testimony. Suggestion of desired responses here denied the defendant a fair trial."

The motion to correct errors did not specifically state which questions Defendant objected to as leading. It is well settled a party cannot raise a question for review by generally referring to it in the motion to correct errors and then specifically indicate what the errors were on appeal. *Brumfield v. State,* (1982) Ind., 442 N.E.2d 973,

974. In order to preserve error for appellate review, the alleged errors must be stated with specificity in the motion to correct errors. *Prine v. State,* (1983) Ind., 457 N.E.2d 217. In order to determine this issue, the trial court would have had to search the lengthy transcript to determine which, if any, of the Prosecutor's leading questions resulted in error by the trial court. Defendant's Motion to Correct Errors, therefore, does not sufficiently preserve the error for review on this appeal and we consider it waived. *Brumfield, supra; Prine, supra.*

### XIII

■ The trial court, during final instruction, gave State's tendered Instruction No. 6, which was essentially a restatement of Ind. Code § 35–41–2–4 (Burns Repl. 1979), the statute establishing accessory liability. Appellant claims Instruction No. 6 is an accomplice instruction which defines culpability for aiding or abetting in the commission of a crime, and since there was no co-defendant being tried, the instruction did not apply to the issues and should have been refused. Defendant further claims that the giving of the instruction was error because it only served to confuse the jury. It is well settled that one can be charged as a principal and convicted on proof that he aided or abetted another in committing the crime. *Hoskins v. State,* (1982) Ind., 441 N.E.2d 419. Instructions on an accused's liability as an accessory are proper where the accused is charged as a principal, assuming the evidence supports such instructions. *Lawson v. State,* (1980) 274 Ind. 419, 412 N.E.2d 759, *cert. denied.* (1981) 452 U.S. 919, 101 S.Ct. 3057, 69 L.Ed.2d 424. *See also Ward v. State,* (1982) Ind., 438 N.E.2d 966. Defendant and Bennett were friends. Weeks before the murders, they discussed committing a crime for monetary gain. Defendant told Bennett he knew where they could obtain some money and on the day of the crime Defendant and Bennett were together in the afternoon, planning the crimes. Defendant had ammunition and a pistol, which Bennett had given him, and Bennett had a sawed-off

shotgun. As planned, Defendant and Bennett, in concert, perpetrated the robbery of the Thompson home, although all of the evidence clearly showed Defendant shot and killed the Thompsons and wounded Brown. Since each aided the other, the acts of each can be imputed to both. Each is liable for everything done by his confederate which follows incidental to the execution of the common design, even though it was not originally intended as part of the scheme. *Hoskins, supra.* Therefore, although Bennett was not being tried with Lowery, it was proper for the court to instruct the jury on this subject. We see no error in the giving of the accomplice instruction. *Hoskins, supra; Lawson, supra.*

### XIV

Defendant next contends there was insufficient evidence to sustain the jury's verdicts of guilty on two counts of murder and one count of attempted murder. He argues that since the testimony of Officers Chase, Bridge, and Ross and the former testimony of James Bennett was improperly admitted, we should not consider such testimony. As we already indicated, the testimony of Bennett, Bridge, Chase, and Ross was properly admitted; thus, it is evidence we will consider.

 The well settled standard and scope of review for sufficiency of evidence challenges is that we do not reweigh the evidence nor judge the credibility of witnesses, but consider only evidence most favorable to the State and all reasonable inferences to be drawn therefrom. When there is substantial evidence of probative value to support the conviction, the finding of the trier of fact will not be disturbed. *Smith v. State,* (1983) Ind., 455 N.E.2d 346; *Pavone v. State,* (1980) 273 Ind. 162, 402 N.E.2d 976, *reh. denied.* Defendant claims Bennett's testimony, incriminating the defendant, came from an unsavory source and should not be considered. This, of course, is a matter of credibility going to the weight of the evidence and for the determination of the jury. *Id.* The uncorroborated testimony of an accomplice is sufficient to support a conviction. *Stewart v. State,* (1982) Ind., 442 N.E.2d 1026; *Pavone, supra.* In addition to Bennett's testimony, however, Janet Brown gave an eyewitness account of Defendant's commission of these crimes, unequivocally identifying Defendant as the perpetrator. *McBrady v. State,* (1984) Ind., 459 N.E.2d 719. These witnesses' testimony was corroborated by other witnesses and Defendant by his statements to police officers and a cell mate. There was more than sufficient evidence to justify the jury in arriving at the verdicts they returned.

### XV

Defendant claims the death penalty was improperly imposed for the following reasons: the aggravating factors do not outweigh the mitigating factors; the jury's recommendation is insufficient; the trial court did not state the aggravating factors were found beyond a reasonable doubt; and the trial court's finding that the murders were committed while attempting a robbery is improper as it differs from the facts charged.

 With respect to Defendant's claims regarding the jury's general sentencing recommendation, the trial court's failure to specifically state that the aggravating factors were found beyond a reasonable doubt and the court's finding that the murders were committed during a robbery, the record shows Defendant did not raise these issues in his motion to correct errors. He raised them for the first time on this appeal. The failure to properly raise issues in the Motion to Correct Errors generally results in a waiver of the claimed errors. *Badelle v. State,* (1983) Ind., 449 N.E.2d 1055; *see Brewer v. State,* (1981) 275 Ind. 338, 417 N.E.2d 889, *cert. denied,* (1982) 458 U.S. 1122, 102 S.Ct. 3510, 73 L.Ed.2d 1384, *reh. denied,* (1982) 458 U.S. 1132, 103 S.Ct. 18, 73 L.Ed.2d 1403. Since the death penalty was imposed in this cause, however, we will review the state of the record concerning these questions.

■ The general recommendations returned by the jury did not expressly use the language of findings beyond a reasonable doubt. The jury returned prepared forms with final instructions printed thereon. The trial judge, however, thoroughly and adequately instructed the jury, pursuant to Ind. Code § 35–50–2–9 (Burns Rep. 1979), how they were to weigh the evidence and determine whether to recommend the death sentence. Further, the trial judge instructed the jury, more than once, that before they could return a recommendation of death they must make a finding that the State proved at least one of the aggravating circumstances beyond a reasonable doubt. He specified that if they did not find at least one aggravating circumstance existed beyond a reasonable doubt, they could not recommend the death penalty. He also stated that if they found at least one aggravating circumstance existed beyond a reasonable doubt, then they could recommend the death penalty. He further told them they must consider any mitigating circumstances and find the aggravating circumstances outweighed the mitigating circumstances before they could return a recommendation of death. He then recited each mitigating circumstance provided in Ind.Code § 35–50–2–9 and instructed them to consider whether or not those mitigating circumstances outweighed the aggravating circumstances concerning the recommendation of the death penalty. Clearly, the jury was instructed that before they could return a recommendation of death on the appropriate form the trial judge had given them, they were required to make findings beyond a reasonable doubt. On appeal it is presumed the jury obeyed the trial court's instructions. *Woolston v. State*, (1983) Ind., 453 N.E.2d 965. Defendant does not offer any evidence indicating otherwise. Further, the jury only recommends whether to impose the death sentence; the trial judge makes the final decision. Ind.Code § 35–50–2–9; *Schiro v. State*, (1983) Ind., 451 N.E.2d 1047, *cert. denied*, (1983) —— U.S. ——, 104 S.Ct. 510, 78 L.Ed.2d 699. Given the above facts, we can only conclude the jury made their findings beyond a reasonable doubt, such that no error has been shown.

■ Although Defendant's claim that the trial court's findings for sentencing do not use the expression "beyond a reasonable doubt" is true, it is apparent the trial judge knew and understood well the nature of the findings and made them in accordance with the law. This is first indicated by his instructions to the jury in which he told them that they would make a recommendation and he would make the ultimate findings. At the sentencing, the trial judge stated the law required him to find aggravating and mitigating circumstances and instructed the court reporter to make his findings part of the record in this cause. He then stated he would review the aggravating and mitigating circumstances and make his findings of fact as required by Indiana law. It is apparent he would do so pursuant to Ind.Code § 35–50–2–9. The judge then expressly found Defendant intentionally killed these victims while attempting to rob them and was motivated by pecuniary gain. He found the victims of the crime were aged and defenseless people who did not induce or provoke Defendant to commit the crimes or take part in them in any way. The Judge further found Defendant acted under no one's domination, but acted in a cold blooded, planned manner by killing two defenseless people and attempting to kill another. The judge then went through each of the mitigating circumstances articulated in Ind. Code § 35–50–2–9 and disposed of them. He first found Defendant's conduct caused and threatened serious bodily harm in that it resulted in the killing of two people and the attempted killing of a third, that the defendant contemplated that his criminal conduct would cause or threaten serious bodily injury since "you specifically told this jury and the people in this court that you went up there to kill them... ", (Record at 205), that there was no provocation from the people to cause the actions against them from the defendant, that there was no excuse or justification for the criminal conduct, that the defendant did

have a substantial criminal record, that there was no excuse because of youth or old age that would support a finding that Defendant lacked substantial judgment in committing the offenses, that Defendant was not acting from a desire to provide necessities for his family or himself, that Defendant was not suffering from a mental or physical condition that reduced his capability, and that Defendant did not in any manner assist authorities or help in any manner in the solution of this cause but rather thwarted the authorities in attempting to hide and blame it on others. The court then found that there were no mitigating factors favoring Defendant and that the record revealed nothing short of a brutal, cold blooded, pre-planned killing of elderly people. The record amply supports the trial judge in all of his findings regarding aggravating and mitigating circumstances and his findings are sufficient to satisfy the requirements of § 35–50–2–9. *Daniels v. State*, (1983) Ind., 453 N.E.2d 160.

■ Defendant also complains that the trial court's findings that the murders were committed while Defendant was attempting a robbery is an improper finding as the charges stated the murder was committed during a burglary. We do not find the trial court's characterization of the aggravating factor improper or prejudicial to the defendant. First, Defendant did not raise this alleged error in his motion to correct errors. Second, burglary is the breaking and entering of a building or structure of another with intent to commit a felony therein. Ind.Code § 35–43–2–1 (Burns Repl.1979). It is apparent and clear here that Defendant entered this property with intent to commit the felony of robbery. That is what he was doing at the time he committed these murders. He went there with the express purpose of obtaining money and property from the Thompsons. Even after he had committed the crimes and the alarm was sounding, he expressed a desire to continue finding something to take with him. The only thing that prevented him was fear he would be caught. We see no error on this issue.

■ Defendant contends his past experiences in mental institutions and lack of parental love and guidance are an overriding and mitigating factor. The trial court, after expressly reviewing the entire record for possible mitigating factors, could not isolate a single mitigating factor. The court was not required to believe Defendant's prior parental problems and experiences in mental institutions were mitigating factors. *Allen v. State*, (1983) Ind., 453 N.E.2d 1011. The trial court's consideration of aggravating and mitigating circumstances is discretionary and since the record clearly supports the judge's findings, we do not find he abused his discretion. *Green v. State*, (1983) Ind., 451 N.E.2d 638.

■ An examination of the entire record, pursuant to our responsibility to review the imposition of the death penalty, clearly supports the conclusion that imposition of the death penalty was appropriate, considering the nature of the offense and the character of the defendant. As this opinion already amply demonstrates, there was proof beyond a reasonable doubt that this defendant intentionally killed the Thompsons. He expressed animosity toward them because of his prior relationship with them and further expressed a desire and intent to get money and property from them. The trial judge told the defendant during sentencing, "I can find no factor that mitigates in your favor in this case. You have nothing going for you except a brutal cold blooded pre-planned killing of old people." (Record at 207). At another point he stated, "There are no, there is no justification and not even the wildest theorist can provide the justification for what you did under any circumstances of logic or reason." (Record at 205). The record patently shows the egregious nature of these offenses and the character of this offender. The trial court carefully complied with the proper procedures pursuant to statute and case law, and we find that the imposition of death, recommended by the jury and imposed by the trial court, was not arbitrarily

or capriciously arrived at and is reasonable and appropriate.

We affirm the trial court in its judgment, including its imposition of the death penalty. This cause is accordingly remanded to the trial court for the purpose of setting a date for the death sentence to be carried out.

GIVAN, C.J., and HUNTER, J., concur.

DeBRULER, J., concurs and dissents with separate opinion.

PRENTICE, J., concurs in result with separate opinion.

PRENTICE, Justice, concurring in result.

I concur in the majority opinion insofar as it affirms the Defendant's conviction.

With respect to the sentence of death, I am of the opinion that there was a rational basis for its imposition and that it should, therefore, be affirmed under our rules.[1] For the reasons expressed in my concurring and dissenting opinion in *Schiro v. State* (1983), Ind., 451 N.E.2d 1047, 1068, I agree with Justice DeBruler that Defendant's history of mental disturbance may not be disregarded in the weighing process; and I, therefore, believe that the trial court's statement, "I can find no factor that mitigates in your favor in this case" was an unfortunate choice of words that, standing alone, would suggest error. In context, however, it is apparent to me that the court did not ignore that history. He previously made a finding that Defendant was not suffering from a mental condition that reduced his capabilities. I take this statement to mean that Defendant's mental disability was not so extensive as to have been a substantially contributing factor to his crimes. Also, the court found specifically: "There is nothing in this record to indicate that you were under the influence of any mental or emotional disturbance when you committed these murders and attempted murder."

I also note that counsel has not argued that no consideration was given to the Defendant's unfortunate history of mental disturbances. For these reasons, I am comfortable in my belief that the trial judge did, in fact, give some consideration to this matter, although his statement, first above quoted, suggests otherwise. The weight that he accorded to that circumstance is reserved to his discretion.

DeBRULER, Justice, concurring and dissenting.

The death sentence statute, and particularly I.C. § 35–50–2–9(e), sets forth the final essential step for the jury to take in arriving at its recommendation, and for the judge to take in arriving at the sentence. The jury and the judge must place the total positive value of the alleged, enumerated and proven aggravating circumstance or circumstances on one side of the scale, and place the net positive value of any mitigating circumstances on the other side of the scale, and thereby establish whether or not the latter is outweighed by the former. A recommendation of death, and the death sentence itself can only be made when the net positive value of any mitigating circumstances is less than the total positive value of the alleged, enumerated and proven aggravating circumstance or circumstances. At this final stage, no other values are relevant.

It was laid down in *Judy v. State* (1981), 275 Ind. 145, 416 N.E.2d 95, that in the death sentencing situation there are "aggravating factors" followed by *Schiro v. State* (1983), Ind., 451 N.E.2d 1047 that there are "counter arguments to any possible mitigating circumstances available to

---

1. "RULE 2. SCOPE OF REVIEW

 (1) The reviewing court will not revise a sentence authorized by statute except where such sentence is manifestly unreasonable in light of the nature of the offense and the character of the offender.

(2) A sentence is not manifestly unreasonable unless no reasonable person could find such sentence appropriate to the particular offense and offender for which such sentence was imposed."

Ind.R.App.Rev.Sen. 2.

the defendant," which *factors* or *counter arguments* operate to negate the existence of or negate the positive value of possible mitigating factors, as for example where a gross history of prior dangerous criminal conduct negates the possible mitigating circumstance which exists when the "defendant has no significant history of prior criminal conduct," under I.C. § 35–50–2–9(c)(1). However, to use a gross history of prior dangerous criminal conduct to diminish the net positive value of other legitimate mitigating circumstances, would be to transform it into an "enumerated" aggravating *circumstance*, contrary to the statute. That would be tantamount to placing such history on the one side of the scale with the alleged, enumerated and proven aggravating circumstance or circumstances. As I read this statute that would be contrary to the command of the statute that the net positive value of alleged, enumerated and proven "aggravating circumstances" be *determined*, and then the net positive value of any mitigating circumstances be *determined*, and then the two values compared. This comparison as contemplated by the statute can only exist and be enforced where we restrict "aggravating factors", and "counter arguments to any possible mitigating circumstances available to the defendant" to their office of demonstrating the absence of particular, express, and discrete mitigating circumstances.

The trial court in its record of sentencing procedures evaluated aggravating circumstances as follows:

\* \* \* \* \* \*

The aggravating circumstances that I am going to find in this case, find (1) that you committed these murders intentionally killing victims while attempting to rob them and that you acted out of motives for pecuniary gain. Doing that, committing a crime for pecuniary gain is a, an especially aggravated offense and that is an offense that is particularly subject to principles of law that I will find later on.

*I will find also that the victim in this crime, the victims in this crime were particularly helpless and defenseless people.*

I will find that you have been convicted of another murder.

I have to look at mitigating circumstances also. The law says that I need to find that you have no particular history of prior criminal conduct. This is not true. The Pre-Sentence Investigation indicates that since the age of 16 you have only been on the outside approximately three years.

\* \* \* \* \* \*

This excerpt is followed by a continued retailing and consideration of the mitigating circumstances expressly set forth in the statute. It is starkly clear here that the trial court found what it considered to be three aggravating circumstances, and places them on one side of the life-death scales. One of these is the fact that the unfortunate victims of this homicide were two helpless and defenseless people. While true, that fact, and the manner in which it reflects appellant's dangerous character, is not an aggravating circumstance upon which the death sentence may rest. Such finding is surely error, and requires a remand for a new sentencing hearing.

Furthermore, according to the uncontradicted evidence before the court on sentencing, appellant was committed by due course of law to two separate psychiatric hospitals between the ages of 16 and 18. I can find no basis at all for not giving this fact some positive weight as a mitigating circumstance. That confinement was followed by immediate and continuous anti-social and criminal behavior. This is not to say that there is an excuse or justification in this prior time in mental hospitals for appellant's crimes. It is rather to say that such hospitalization cannot simply be declared benign in arriving at the sentence of death. For this reason also, I would set aside the death sentence and remand for a new sentencing hearing. I concur however in affirming the convictions.